**Novel HINTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 01–CF–1145.**

District of Columbia Court of Appeals.

Argued En Banc April 29, 2009.

Decided Sept. 3, 2009.

Walter S. Booth for appellant.

Mary B. McCord, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellee.

Jaclyn S. Frankfurt, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, amicus curiae.

Before WASHINGTON, Chief Judge, and RUIZ, REID, GLICKMAN, KRAMER, BLACKBURNE–RIGSBY, THOMPSON, and OBERLY, Associate Judges.*

GLICKMAN, Associate Judge:

After a jury trial, appellant Novel Hinton was convicted of one count of possessing a controlled substance, phencyclidine (PCP), with the intent to distribute in a drug-free zone.[1] Midway through Hinton's trial, over his objection, the court invoked its power under Superior Court Rule of Criminal Procedure 24(c) to remove a member of the jury, Juror 8, and replace him with an alternate. A three-judge panel of this Court concluded that the trial court erred by removing Juror 8 in violation of the standards set forth in Rule 24(c).[2] Nevertheless, bound by precedent to conclude that the error was harmless, the panel upheld Hinton's felony conviction. Under an earlier panel's decision in (Nathaniel) Thomas v. United States,[3] Hinton was required to demonstrate "that as a result of the removal of the juror, 'an impaneled juror failed to conscientiously apply the law and find the facts,'" which he could not do.[4] We granted en banc review to consider whether Thomas, and thus the panel's opinion, took the correct approach in placing the burden on Hinton to show that he was prejudiced by the Rule 24(c) violation. Concluding that the

---

* Associate Judge FISHER took no part in the consideration or decision of this case.

1. Hinton also was charged with misdemeanor possession of marijuana; that count was tried to the judge.

2. Hinton v. United States (Hinton I), 951 A.2d 773, 779 (D.C.2008).

3. 824 A.2d 26 (D.C.2003).

4. Hinton I, 951 A.2d at 780 (quoting Thomas, 824 A.2d at 31) (brackets omitted).

burden properly belongs to the government to show that the error was harmless, and that harmlessness has not been shown, we now reverse Hinton's felony conviction for possession of PCP with intent to distribute.[5] Before reaching that conclusion, though, we are obliged to consider the extent to which Rule 24(c) operates as a constraint on the trial court's discretion, and whether the defendant has standing to complain of a violation of the Rule.

## I. Factual Background

### A. The Evidence at Trial

On January 23, 2001, police officers were on patrol near the Fort Davis Recreation Center when they noticed three men sitting in a car parked across the street from the Center. From a distance, the officers could see that the car was filled with smoke, and the men inside appeared to be trying to hide by reclining their seats and ducking. As the officers approached the vehicle on foot, they recognized the smell of marijuana. In the ensuing investigatory stop, the officers found a hand-rolled "blunt" cigar burning on the back seat of the car. The blunt field-tested positive for tetrahydrocannabinol, the active ingredient in marijuana. Hinton, the only occupant of the back seat, was placed under arrest.

According to the officers' testimony at trial, as they searched Hinton following his arrest, they smelled a pungent odor characteristic of PCP and felt a suspicious lump in the upper-arm area of the sleeve of the black jacket he was wearing. The officers rolled the jacket off of Hinton's shoulders and retrieved from the sleeve a ziplock bag. The bag contained many smaller packages of a green weed-like substance redolent of PCP. (Its identity was later confirmed by laboratory analysis.) The officers also testified to finding $555 in cash in the right front pocket of Hinton's jacket. Photographs of Hinton taken at the scene of the arrest and introduced at trial do not, however, show him wearing any jacket. The officers explained this apparent inconsistency by testifying that the photographs were taken after they had taken the jacket off of Hinton's shoulders and pulled it down to his handcuffed wrists.

Four civilian witnesses contradicted the officers' testimony. Kareem Jackson, the driver of the car and a government witness, stated that Hinton was not wearing any jacket at the time of his arrest. In addition, Jackson testified that he neither smelled PCP in his car nor saw the police remove the suspected drugs from Hinton. Kevin Davis, the other passenger in the car and a defense witness, testified similarly. Davis stated that Hinton was wearing a "black Hobo sweat shirt," not a jacket; that while he recognized the odor of PCP, he did not smell it that night; and that he did not see the police recover any PCP from Hinton. Michael Stoutamire, a passer-by who happened to see the arrest, testified that he watched the police search Hinton, recover cash from his pants pocket, and then place him in handcuffs. Stoutamire, too, did not see the police discover any drugs on Hinton. Finally, Hinton himself testified. He denied possessing any PCP and said that he was wearing a black sweatshirt, not a jacket. He testified that the officers found the cash (gambling winnings, he claimed) in his pants pocket when they patted him down before handcuffing him.[6]

---

5. We do not reverse Hinton's misdemeanor conviction for possession of marijuana. The error did not affect the bench trial.

6. Hinton admitted having smoked marijuana with Jackson and Davis earlier in the evening but denied any knowledge of the blunt found by the police on the back seat of the car.

Thus, the key factual question for the jury to resolve at Hinton's trial was whether he in fact was wearing a jacket containing PCP at the time of his arrest, as the police witnesses claimed but the civilian witnesses denied and the arrest photographs failed to confirm.

### B. The Replacement of Juror 8

The trial judge empaneled fourteen jurors—twelve regular jurors and two alternate jurors.[7] The jurors in seats 5 and 12 were designated as the alternates, but the panel was not informed who the alternates would be. Before the trial began, the judge instructed the panel that its members would be permitted to propose additional questions to be put to the witnesses after counsel had finished with their examinations "if there's any information that you think you need to help you decide this case."[8] The panel members took advantage of this opportunity by propounding numerous questions throughout the trial. One member, the juror in seat 8, eventually would be removed as a regular juror because of the questions he asked.

Juror 8 initially drew attention to himself on the morning of the second day of trial. Upon arriving at court that morning, the judge looked into the jury room to check on the coffee, and a juror—later identified by the judge as Juror 8—asked to speak with her about something unrelated to the case. He then asked the judge what would constitute a "split" and whether the jury would "have to agree in this case." The judge responded that she could not speak privately with the juror about those questions. The judge promptly informed the parties of this brief contact. No one attached particular significance to the incident. When the panel returned to the courtroom, the judge cautioned the jurors that she could not speak with them individually about the case. She promised to address the subject of juror agreement in her final instructions and reminded the jurors to refrain from discussing the case until they were instructed to deliberate. Following these instructions, Juror 8 did not attempt any further ex parte communication with the judge.

Subsequently, in the course of the trial, Juror 8 submitted nine questions to be put to the witnesses. Because the juror's handwriting was poor, the judge asked him to rewrite several of his questions so they would be legible. At one point the judge had to admonish Juror 8 not to address the witness directly. The juror's questions—the spontaneous inquiries of a layperson, not a lawyer—were not all models of clarity and precision. But the questions could be discerned, most of them were asked without objection, and the witnesses usually did not have trouble understanding them.

Six of Juror 8's questions focused on the primary issue in dispute—the asserted linkage between Hinton and the black jacket in which the police said they had found PCP. He asked an arresting officer, "How do I know [the] jacket belongs to [the] defendant and was not borrowed?" The juror's other questions in this area zeroed in on the curious absence of the jacket from the photographs of Hinton taken on the scene. He pressed the officers on timing, asking one, for instance,

---

7. *See* Super. Ct.Crim. R. 24(c)(1) ("The Court may empanel no more than 6 jurors in addition to the regular jury to sit as alternate jurors.").

8. *See generally Plummer v. United States,* 870 A.2d 539, 542–43 (D.C.2005) (finding no abuse of discretion in permitting jurors to propose questions); *Yeager v. Greene,* 502 A.2d 980 (D.C.1985) (declining to issue writ of mandamus to forbid juror questioning).

"Where [sic] you present on scene when photo was taken? Or had photo already been taken before you arrived on scene?"[9] If Hinton's photo had been taken after the marijuana blunt was discovered but before the PCP was found, the jacket arguably should have been visible in the photographs—*if* Hinton actually was wearing it. Other questions concerned the physical location of the jacket: "Were the sleeves taken down to wrists or elbows[?]" and "[w]as packet removed from pulled down jacket or from garment still [on] body of defendant?" These questions directly addressed the police explanation that the jacket could not be seen in the photos because it had been pulled down.

In addition to these questions, Juror 8 asked defense witness Davis (Hinton's fellow passenger) if he had touched Hinton on the shoulder when he got out of the car—perhaps seeking to learn whether Davis had a particular reason to remember whether Hinton was wearing a jacket, or if Davis had felt the suspicious lump described by the police officer who searched Hinton. Finally, Juror 8 posed two questions about the drug-testing process: "What is the reason for two marijuana tests?" (i.e., the field test and the subsequent DEA lab test), and "The two tests are at the scene and the lab[?]"

On the fourth day of trial, the prosecutor told the judge that he had "increasing concerns" about Juror 8's ability "to communicate [and] effectively deliberate with other jurors." The judge commented that the juror had been asking "really off the wall questions that would indicate that person has difficulty following the evidence in this case." She noted that she had observed "pained" looks on other jurors' faces when Juror 8 submitted a question, and she expressed doubt about his "level of intelligence." Hinton's counsel voiced his disagreement, defended Juror 8's questions as relevant and "insightful," and objected to his removal from the jury. The judge took no action at that time.

The following day, however, the judge reopened the discussion about Juror 8. Hinton's counsel again objected to his removal, asserting that his questions had been "very insightful" and that "no showing" had been made that would justify excusing him. Counsel contended that "[j]ust because some of his questions are leaning toward favoring the defense doesn't necessarily mean the government has a right to excuse this particular juror," and that removing him "would be denying [Hinton] the right to have a fair trial by a jury of his peers." The judge responded that she had carefully reviewed Juror 8's questions and did not "read them as favoring the defense," but rather as being "strange and bizarre" and difficult to comprehend or answer. Reiterating that she had "observed at least three other jurors wince, put their hands over their faces and look exasperated with" Juror 8, the judge said her "concern is that he's a strange person and that he won't be able to deliberate fairly because of his strangeness." Hinton's counsel rejoined that "[j]ust because a person seems to be strange doesn't give the court ... reason to strike [him]." The prosecutor interjected that Juror 8's "inability to communicate" would "affect his ability to deliberate." Hinton's counsel disputed this conclusion, insisting that the juror had "communicated quite well," and that merely "because he doesn't write well or he doesn't seem to express his opinion on the paper doesn't mean that he cannot express it verbally."

---

9. Similarly, Juror 8 asked other officers: "Arrest was for marijuana. Was photo then taken?" "Was a photo taken for possession of marijuana or for the PCP?" "For what charge was defendant photographed?" "Was photo taken for marijuana?"

Overruling Hinton's objection, the judge concluded that Juror 8's questions revealed "the extent to which he would have difficulty serving in deliberation" and "demonstrate[d] that this is a hung jury waiting to happen because . . . he doesn't think along the wavelength of normal functioning people in my view."[10] Accordingly, and without further inquiry of the juror, the judge removed Juror 8 from the jury and replaced him with one of the alternate jurors.[11]

## II. Discussion

Hinton argues that by removing Juror 8 and replacing him with an alternate, the trial court abused its discretion and violated his rights under Criminal Rule 24(c), because the juror was neither shown nor found to be "unable or disqualified to perform juror duties."[12] Consequently, Hinton contends, his felony conviction must be reversed and he must be afforded a new trial. As we shall see, this is by no means a simple legal claim. To address it properly, we must proceed through several steps of analysis.

We begin by considering two antecedent questions regarding Criminal Rule 24(c). First, does that Rule in fact set forth a limitation on the trial court's discretionary authority to replace a juror with an alternate? Second, if so, may the defendant complain of the Rule's violation? In Sections II.A and II.B, we address these questions in turn, answering each of them in the affirmative. We conclude that

Criminal Rule 24(c) is a narrow grant of power to the trial court; if the specified conditions are not met, the court is without legal authority to replace a juror with an alternate during trial. The limitations set forth in Rule 24(c) serve to protect the defendant's rights to trial by jury and to a unanimous verdict, which would be imperiled if the court could replace a juror with an alternate arbitrarily or with insufficient justification. Therefore, we conclude, a defendant has standing to object to the trial court's removal of a juror in contravention of Rule 24(c).

Accordingly, in Section II.C, we examine whether the trial court exercised its discretion erroneously by removing Juror 8. Here, too, there is a two-fold inquiry. First, did the removal violate the standard set forth in Rule 24(c)? Second, must Hinton show that the violation caused him specific prejudice in order to establish error warranting relief? We conclude that Rule 24(c) was violated in this case by Juror 8's removal, and that a particularized showing of prejudice is not a prerequisite to a determination that the court erred.

Lastly, having found error, we consider in Section III whether it was harmless. We cannot find harmlessness on the present record. We do not have the necessary assurance that, had Juror 8 not been replaced, all twelve members of Hinton's jury would have voted to convict him.

**10.** The judge did not purport to rely on Juror 8's ex parte contact with her in the jury room on the second day of trial. While that contact was inappropriate, it was not perceived to be serious enough to be disqualifying.

**11.** The judge did not excuse Juror 8 then and there, however; instead, she retained him as an alternate juror and did not release him until the jury retired to deliberate at the close of the trial. (None of the jury members, in-

cluding Juror 8 himself, was informed of his change in status from regular juror to alternate.) The retention of Juror 8 as an alternate seems inconsistent with the judge's finding that he was unfit to serve, but it perhaps was intended to avoid embarrassing him unnecessarily.

**12.** Super. Ct.Crim. R. 24(c)(1).

## A. Does Rule 24(c) Limit the Trial Court's Authority to Replace an Empaneled Juror?

■ Our inquiry into whether Superior Court Criminal Rule 24(c) limits the trial court's authority begins with the Rule's text.[13] In pertinent part, the Rule provides:

The Court may empanel no more than 6 jurors, in addition to the regular jury, to sit as alternate jurors. *An alternate juror, in the order called, shall replace a juror who becomes or is found to be unable or disqualified to perform juror duties.* Alternate jurors shall (i) be drawn in the same manner, (ii) have the same qualifications, (iii) be subject to the same examination and challenges, and (iv) take the same oath as regular jurors. An alternate juror has the same functions, powers, facilities and privileges as a regular juror.[14]

Notably, the Rule does not limit explicitly the trial court's authority to remove an empaneled juror. Instead, it states that an alternate "shall replace" a juror who is incapacitated or disqualified. Therefore, one might conclude, Rule 24(c) does not check the trial court's power to remove a juror, but merely commands it to use an alternate when the specified circumstances arise. When those circumstances are not present, it might be argued, the court retains inherent power to replace an empaneled juror with an alternate whenever, in its discretion, it deems such a replacement necessary or appropriate. Another reading of Rule 24(c) is equally consistent with its text, however: the trial court may replace an empaneled juror *only* if that juror "becomes or is found to be unable or disqualified to perform juror duties." Absent such circumstances, the court lacks authority to replace the juror. This is the reading we have given to Rule 24(c) in the past.[15]

To resolve the ambiguity in Rule 24(c), we perforce must look to its genesis—to the common-law backdrop which led to the adoption of the Rule and to the Rule's drafting history. As we shall explain, at common law, the trial court's authority to remove an empaneled juror was narrowly circumscribed. Because twelve jurors were required to return a verdict and alternates had not yet been invented, the loss of a single juror necessitated a mistrial. As a corollary, trial courts had no discretion to "withdraw a juror," thereby intentionally causing a mistrial, unless declaration of a mistrial was truly necessary. Nonetheless, as longer trials became more common, mistrials were triggered with increasing frequency by the death, illness, or other disability of a juror. The first alternate juror statutes were enacted in response to that growing problem. They enabled courts to avoid having to declare a mistrial when a juror's incapacitation otherwise would have required it. No expansion of the trial court's limited authority to withdraw a juror was contemplated in these enactments, which evolved—with no material change in their scope or purpose—into what is now our Rule 24(c). That Rule thus operates as a narrow grant of authority to the trial court, and when its conditions are not met, the court is without authority to replace an empaneled juror with an alternate.

---

13. *See, e.g., In re Greenspan,* 910 A.2d 324, 335–36 (D.C.2006).

14. Super. Ct.Crim. R. 24(c)(1) (emphasis added).

15. *See, e.g., (Nathaniel) Thomas v. United States,* 824 A.2d 26, 30 n. 7 (D.C.2003) ("Juror No. 1 could properly be removed only if the requirements of Rule 24(c) were satisfied.").

### 1. The Common–Law Background of Rule 24(c)

At common law, trial courts were constrained by a strict rule that a valid verdict required a unanimous jury of twelve.[16] If one of the twelve jurors disappeared or became incapacitated during the trial, the jury could not act, and the court was required to declare a mistrial.[17] To minimize costs and delays associated with the mistrial, common-law courts frequently held the retrial immediately. The eleven remaining jurors would be retained, and the judge would order an abbreviated venire or a *tales* (essentially a supplemental supply of jurors) to select a twelfth.[18] With the jury reconstituted, the trial began anew.[19] With only minor differences, the same practice prevailed in early American jurisprudence.[20]

The twelve-juror rule also provided judges with a convenient fiction. A judge who considered it desirable to declare a mistrial, for whatever reason, had only to "withdraw a juror" to do so. In one case, for example, "[w]hen the Jury did not agree, they were called over, and one not answering when he was called, the Jury were then discharged, a sufficient number not appearing, it being a fiction of law that but eleven were present."[21] Before about 1700, the trial court's power to declare a

16. *See, e.g., Williams v. Florida*, 399 U.S. 78, 87–89, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (noting importance of twelve jurors at common law, though characterizing it as a "historical accident"); *Johnson v. Louisiana*, 406 U.S. 356, 371, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (Powell, J., concurring in the judgment) (noting common-law requirement of unanimity); Matthew Hale, 2 *Historia Placitorum Coronae* [*The History of the Pleas of the Crown*] *296, *available at* http://books.google.com/books?id=QWo0AAAAIAAJ (noting that it was legal error to take a verdict from a jury if only eleven of its members had been sworn).

17. *See, e.g., R v. Edwards*, (1812) Russell & Ryan's Crown Cases 224, 224–25, 168 Eng. Rep. 772, 772–73 & n.(a) (Exch.), *available at* http://www.commonlii.org/int/cases/EngR/1812/32.pdf (illness of juror); *R v. Scalbert*, (1794) 2 Leach's Crown Cases 620, 620, 168 Eng. Rep. 412, 412–13 & n.(b) (York assizes), *available at* http://www.commonlii.org/int/cases/EngR/1730/27.pdf (same, and discussing other cases in report).

18. *See, e.g., Edwards*, Russell & Ryan's Crown Cases at 224–25, 168 Eng. Rep. at 772–73; William Feilden Craies & Guy Stephenson, *Archbold's Pleading, Evidence, and Practice in Criminal Cases* 224 (23d ed. 1905), *available at* http://books.google.com/books?id=EpI0AAAAIAAJ.

19. *See R v. Bertrand*, (1867) 4 Moore's N.S. 460, 480–82, 16 Eng. Rep. 391, 399–400 (P.C.) (appeal taken from N.S.W.), *available*

*at* http://www.commonlii.org/int/cases/EngR/1867/20.pdf (suggesting that where the jury is discharged and reconstituted, the witnesses must be re-examined and that it is insufficient for the court to summarize the evidence and ask the witnesses to state whether they agree with the summary).

20. *See, e.g., West v. State*, 42 Fla. 244, 28 So. 430, 431–32 (1900); *State v. Davis*, 31 W.Va. 390, 7 S.E. 24, 29–30 (1888); *Stone v. People*, 3 Ill. (2 Scam.) 326, 336–38 (1840). While common-law courts were required to allot the defendant a full set of peremptory challenges, which could be used on the eleven presumptively seated jurors from the first trial as well as the new twelfth juror, American courts did not always observe this rule. *Compare Edwards*, 168 Eng. Rep. at 773 (approving allowance of full set of challenges), *and* Craies & Stephenson, *supra* note 18, at 224 (noting that full set was usual practice), *with Davis*, 7 S.E. at 29–30 (reasoning that defendant had already had opportunity to challenge the eleven jurors remaining from the first trial, and so only permitting a challenge as to the new twelfth juror), *and Stone*, 3 Ill. (2 Scam.) at 337–38 (same).

21. *Conway v. The Queen*, (1845) 7 Ir. L.R. 149, 164 (Q.B.) (opinion of Perrin, J.), *available at* http://books.google.com/books?id=6wwWAAAAYAAJ. *See also, e.g., Davenport v. District of Columbia*, 65 A.2d 209, 210–11 (D.C.1949) (discussing defendant's motion to withdraw a juror to obtain mistrial after two government witnesses discussed case during

mistrial was relatively unconstrained. But—inevitably—some judges abused the power, "withdrawing a juror" and declaring a mistrial in order to thwart an acquittal. In one infamous case, the judge discharged the jury as to two defendants when a prosecution witness unexpectedly failed to testify against them (two witnesses being needed for a conviction for treason).[22] The two defendants later were reindicted (over their objections that they had already been placed in jeopardy for the same crime), and then tried, convicted and executed.[23] In reaction to such abuses, common law judges eventually settled on a generally applicable rule of practice: no juror could be withdrawn, and no jury could be discharged, unless it was necessary to do so.[24]

What constituted sufficient "necessity," however, was committed to the trial court's discretion. English courts therefore expressed some doubt as to whether the erroneous discharge of a jury could be pleaded as error on appeal.[25] Despite that, the rule against unnecessary mistri-

recess); *Jones v. Knowles*, 1 D.C. (1 Cranch) 523, 13 F. Cas. 986 (1808) (No. 7474) (ordering juror to be withdrawn because evidence was erroneously admitted); *cf. People ex rel. Epstein v. Lawes*, 164 Misc. 58, 297 N.Y.S. 386, 388–89 (1937) (stating that the "fiction of a withdrawn juror is outmoded and has long been discarded," and rejecting argument that granting mistrial as to one defendant in joint trial necessarily required mistrial as to all because mechanism was withdrawal of a juror).

22. *Ireland's Case*, (1678) 7 Howell's State Trials 79, 120 (O.B.), *retrial reported at Whitebread's Case*, (1679) 7 Howell's State Trials 311, 315–18 (O.B.), *available at* http://books.google.com/books?id=IxIwAAAAYAAJ.

23. *Whitebread's Case*, 7 Howell's State Trials at 315–18 (overruling of objection), 417–18 (conviction), 585–86 (execution).

24. *See, e.g., R v. Charlesworth*, (1861) 1 Best & Smith 460, 504, 121 Eng. Rep. 786, 803 (Q.B.) (opinion of Cockburn, C.J.), *available at* http://www.commonlii.org/int/cases/EngR/1861/759.pdf (describing the rule against unnecessary discharges as the "uniform practice of the judicial authorities ... equal to part of the law, which no Judge ought to depart from"). The first time this rule was expressed in an opinion was apparently the flat statement in *R v. Perkins*, (1698) 90 Eng. Rep. 1122, 1122 (K.B.), *available at* http://www.commonlii.org/int/cases/EngR/1738/796.pdf,

that it was the opinion of all the Judges of England, upon debate between them, that

in all capital cases, a juror cannot be withdrawn, though the parties consent to it: that in criminal cases, not capital, a juror may be withdrawn, if both parties consent, but not otherwise; and that in civil causes, a juror cannot be withdrawn, but by consent of all parties.

Later judges questioned the authenticity of the report of the *Perkins* "resolution" as well as the categorical legal rule it expressed. *See United States v. Bigelow*, 14 D.C. (3 Mackey) 393, 415–16 (1884); *Charlesworth*, 121 Eng. Rep. at 800–02, 1 Best & Smith at 498–504 (opinion of Cockburn, C.J.); *The Case of Alexander Kinloch and Charles Kinloch*, (1746) 168 Eng. Rep. 9, 15, Foster's Crown Cases 16, 27–28 (K.B.), *available at* http://www.commonlii.org/int/cases/EngR/1746/788.pdf, *discussed sub. nom. Sir John Wedderburn's Case*, (1746) Foster's Crown Cases 22, 27–28, 168 Eng. Rep. 12, 15 (K.B.), *available at* http://www.commonlii.org/int/cases/EngR/1746/791.pdf.

25. *See Winsor v. The Queen*, (1866) 6 Best & Smith 143, 174, 176, 122 Eng. Rep. 1150, 1162 (Q.B.) (opinion of Cockburn, J.), *available at* http://www.commonlii.org/int/cases/EngR/1866/69.pdf; *see also R v. Wade*, (1825) 168 Eng. Rep. 1196, *available at* http://www.commonlii.org/int/cases/EngR/1825/195.pdf (suggesting that where rule against needless discharges was violated, judges were powerless to dismiss indictment but would recommend pardon by the Crown). *But cf. Kinloch*, 168 Eng. Rep. at 16, Foster's Crown Cases at 30 (rejecting defense analogies and stating, "most of the objections which have been made in the present case may receive this short answer, That they are

als was recognized to protect an important interest of the defendant. The rule prevented the "odious, dangerous and unconstitutional" practice of discharging the jury to avoid an acquittal.[26] And it avoided "imposing great hardship and oppression upon prisoners, especially of the lower class, who may, on one occasion, have the means of obtaining legal assistance and bringing their witnesses, and on a second trial may be without those means."[27]

In early American jurisprudence, more plainly than in coeval British decisions, the rule against unnecessary mistrials was a right the defendant could assert.[28] In part, that was because "state courts ...

blend[ed] the rule against needless discharges of juries into the guarantee against double jeopardy contained in the Federal and State Constitutions,"[29] despite the contrary analysis of roughly contemporary English jurists, who traced the rule to the maxim that once constituted, a jury could not be discharged until it had returned a verdict.[30] This doctrinal commingling would eventually culminate with the Supreme Court's 1978 decision in *Crist v. Bretz* that jeopardy attaches when the jury is sworn.[31] The *Crist* decision rested substantially on the defendant's "valued right to have his trial completed by a particular tribunal."[32] That right, which

levelled at improper exercise of the power, but do not reach the present case."); *Conway*, 7 Ir. L.R. at 184 (opinion of Crampton, J., dissenting) ("*Whit[e]bread's [C]ase* and others have been cited, where the judicial discretion has been improperly exercised; but, as Foster says [in his opinion in *Kinloch* ], it is against this improper exercise of the power, and not the power itself, that objection can be sustained.").

**26.** *Charlesworth*, 1 Best & Smith at 516, 121 Eng. Rep. at 807 (opinion of Crampton, J.).

**27.** *Id.*, 1 Best & Smith at 502, 121 Eng. Rep. at 802 (opinion of Cockburn, C.J.).

**28.** *See Bigelow*, 14 D.C. (3 Mackey) at 422 (noting that the rule "undoubtedly ... came to serve as a protection of the prisoner in criminal cases," even if it should not "be interpreted on the ground that it had such an origin"); *see also Crist v. Bretz*, 437 U.S. 28, 42, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (Powell, J., dissenting) ("Notwithstanding its origin as an aspect of jury practice, the rule against discharge of the jury became a useful defense against Crown oppression in the 17th century.").

**29.** *Crist*, 437 U.S. at 45, 98 S.Ct. 2156 (Powell, J., dissenting). *See also id.* at 45–46 & n. 10, 98 S.Ct. 2156 (collecting cases). *But see generally Bigelow*, 14 D.C. (3 Mackey) 393 (distinguishing between double jeopardy rule and rule against needless discharges).

**30.** *See Crist*, 437 U.S. at 41, 98 S.Ct. 2156 (Powell, J., dissenting) (discussing derivation of doctrine); *Conway*, 7 Ir. L.R. at 178–81 (opinion of Crampton, J., dissenting) (tracing rule to principle that jury cannot be discharged until it has returned a verdict); *Winsor*, 6 Best & Smith at 178–79, 122 Eng. Rep. at 1163–64 (opinion of Blackburn, J.) (adopting reasoning of Judge Crampton in *Conway* ); *Charlesworth*, 1 Best & Smith at 507, 121 Eng. Rep. at 803–04 (opinion of Cockburn, C.J.) (same); *see also Bigelow*, 14 D.C. (3 Mackey) at 423 (same). For expressions of the rule, see, for example, Edward Coke, *The Third Part of the Institutes of the Laws of England* *110, available at http://books. google.com/books?id=--Ik0AAAAIAAJ ("[I]f any person be indicted of treason, or of felony, or larceney, and plead not guilty, and thereupon a jury is retorned, and sworn, their verdict must be heard, and they cannot be discharged."), and William Blackstone, 4 *Commentaries on the Laws of England* *360, available at http://books.google.com/books? id=RwU9AAAAIAAJ ("When the evidence on both sides is closed, and indeed when any evidence hath been given, the jury cannot be discharged (unless in cases of evident necessity) till they have given in their verdict; but are to consider of it, and deliver it in....").

**31.** *Crist*, 437 U.S. at 35–36, 98 S.Ct. 2156 (majority opinion).

**32.** *See id.* at 36, 98 S.Ct. 2156 (quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (internal quotation marks

the Supreme Court also articulated as "the interest of an accused in retaining a chosen jury," descends directly from the common-law bar on needless discharges.[33]

In sum, in American jurisprudence near the end of the nineteenth century, a jury of twelve was required in criminal trials;[34] the incapacitation of a juror required a mistrial;[35] where a juror was not incapacitated, the trial court could "withdraw a juror" and cause a mistrial only in "very extraordinary and striking circumstances";[36] and the defendant could object if he believed the withdrawal was erroneous.[37] As the complexity and duration of trials increased, however, so did the incidence of mistrials attributable to the illness or other incapacitation of jurors.[38] Unhappy that "the time and labor of judges, jurors, and witnesses can all go for nothing and justice be delayed, if not frustrated, through the illness ... of any one man ... out of the twelve,"[39] states began

to experiment with something new to deal with that problem—alternate jurors.

## 2. The Drafting History of Rule 24(c)

By 1932, eleven states had passed statutes providing for the use of alternate jurors to fill in for empaneled jurors who became disabled.[40] Congress looked to do the same:

> Many criminal cases in the Federal courts ... take weeks to try. Cases frequently arise where a juror is disabled after days or weeks of trial, and a mistrial results unless the defendant is willing to proceed with less than 12 jurors. The resulting waste of time and money is considerable. [Permitting alternate jurors] is in the interest of economy and the prevention of waste, and tends to relieve congestion in the courts and expedite the disposition of criminal cases.[41]

omitted)); *see also id.* at 38, 98 S.Ct. 2156 (Blackmun, J., concurring) ("Although I join the Court's opinion, I write to emphasize the fact that I am not content to rest the result, as the Court seems to be, solely on the defendant's 'valued right to have his trial completed by a particular tribunal' ...." (internal citation omitted)).

**33.** *See id.* at 35–36 & nn. 11–13, 98 S.Ct. 2156 (majority opinion).

**34.** *See Thompson v. Utah,* 170 U.S. 343, 349, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), *overruled by Williams v. Florida,* 399 U.S. 78, 99–100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

**35.** *See State v. Davis,* 31 W.Va. 390, 7 S.E. 24, 28–30 (1888); *Commonwealth v. Fells,* 36 Va. (9 Leigh) 613 (1838).

**36.** *United States v. Coolidge,* 25 F. Cas. 622 (Story, Circuit Justice, C.C.D. Mass. 1815) (No. 14,858).

**37.** *See Crist,* 437 U.S. at 45–47 & n. 10, 98 S.Ct. 2156 (Powell, J., dissenting) (noting that nineteenth century state courts "began to

blend the rule against needless discharges of juries into the guarantee against double jeopardy" that defendants had right to assert).

**38.** According to the affidavits of insurance actuaries considered by Congress in 1932, the chance of a juror becoming disabled during a six-week trial was somewhere between twenty and thirty-three percent. *See Alternate Jurors in Certain Criminal Cases,* S.Rep. No. 72–802, at 2 (1932), *microformed on* CIS No. 9488 S.Rp. 802 (Cong. Info. Serv.) [hereinafter Alternate Jurors Act Senate Report].

**39.** Article, *The Jury of Twelve,* 8 Law Notes 425, 425 (Jan. 1905), *available at* http://books.google.com/books?id=-HkqAAAAYAAJ (quoting editorial from the *New York Herald*) (internal quotation marks omitted).

**40.** *See* Alternate Jurors Act Senate Report, *supra* note 38, at 2. California's was one of the earliest, *see* 1895 Cal. Stat. 279 (codified as amended at Cal.Penal Code § 1089 (West 2009)), and perhaps the most influential.

**41.** *Alternate Jurors in Certain Criminal Cases,* H.R.Rep. No. 72–957, at 1 (1932), *micro-*

The resulting 1932 federal law enabled trial courts to empanel up to two alternate jurors. Then, "[i]f, before the final submission of the case, a juror [should] die, or become ill, so as to be unable to perform his duty, the court may order him to be discharged and draw the name of an alternate." [42] By explicitly conditioning the trial court's new power, the Alternate Jurors Act limited it—the court could replace an empaneled juror with an alternate only *if* the juror became "unable to perform his duty" on account of death or illness.

Five years later, the Supreme Court adopted the Federal Rules of Civil Procedure. Dropping the express conditional phrasing of the Alternate Jurors Act, Civil Rule 47(b) employed the phrasing that is still present in our Criminal Rule 24(c): "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." [43] There is little explanation for the specific language chosen in Rule 47(b); the notes to its adoption simply say that "[t]he provision for an alternate juror is one often found in modern state codes," citing the federal Alternate Jurors Act of 1932 and four state laws. [44] Three of the state laws cited appear similar to the federal statute in that they allowed the trial court to replace an empaneled juror with an alternate only if the empaneled juror became incapacitated or disqualified (or "discharged for legal cause"). [45] The fourth state law, enacted in New Jersey, was worded more expansively. It permitted the trial court to empanel fourteen jurors; then, "[s]hould any condition arise during the trial . . ., which, in the opinion of the trial court, justifies the excusal of any of the jurors . . . from fur-

*formed on* CIS No. 9492 H.Rp. 957 (Cong. Info. Serv.).

**42.** An Act To Provide for Alternate Jurors in Certain Criminal Cases, Pub.L. No. 72–209, 47 Stat. 380 (1932) (codified at 28 U.S.C. § 417a) (repealed by Crimes and Criminal Procedures Act § 3442, Pub.L. No. 80–772, 62 Stat. 683, 832 (1948)) [hereinafter Alternate Jurors Act]. The text of the statute was based heavily on California's alternate juror statute. *See* Alternate Jurors Act Senate Report, *supra* note 38, at 2–4.

Only a very small number of cases addressed the Alternate Jurors Act before it was repealed simultaneously with the adoption of the Federal Rules of Criminal Procedure. In the most notable, *Robinson v. United States*, 144 F.2d 392, 397–98 (6th Cir.1944), the Sixth Circuit held that the statute did not deprive the defendant of a constitutional right to a jury of twelve, both because the defendant did have twelve jurors and because he had consented to the replacement of an ill juror with an alternate.

**43.** Fed.R.Civ.P. 47(b) (1960), *quoted in* The Judicial Conference of the United States, *The Jury System in the Federal Courts*, 26 F.R.D. 409, 519 (1960). In 1991, Rule 47(b) was stricken and alternate jurors abolished in civil cases. Fed.R.Civ.P. 47 advisory committee note to 1991 Amendment.

**44.** Fed.R.Civ.P. 47 advisory committee note to 1937 Adoption.

**45.** *See State v. Dalton*, 206 N.C. 507, 174 S.E. 422, 424 & n. 1 (1934) (discussing and quoting North Carolina law: "If before the final submission of the case to the jury a juror becomes incapacitated or disqualified he may be discharged by the judge, in which case, or if a juror dies, upon the order of the judge said additional or alternate juror shall become one of the jury and serve in all respects as though selected as an original juror."); *Bolenbaugh v. State*, 22 Ohio Law Abs. 268, 1936 WL 2103 (Ohio Ct.App.1936) (discussing Ohio law: "Under the provisions . . . if a juror becomes incapacitated or disqualified before the final submission of the case to the jury, upon the order of the judge the alternate juror shall become one of the jury and serve in all respects as though selected as an original juror"); *Commonwealth v. Kramer*, 146 Pa.Super. 91, 22 A.2d 46, 50 (1941) ("[A]lternate jurors are now authorized, who can take the place of jurors who die, become ill or are discharged for legal cause.").

ther service," the trial court could discharge the juror, since the eventual jury of twelve would be selected by lot.[46] The fact that the Advisory Committee for the Federal Rules of Civil Procedure did not adopt the expansive language of the New Jersey statute, and instead identified only two circumstances (inability or disqualification) justifying replacement of a juror with an alternate, implies—though it does not prove definitively—that Civil Rule 47(b) was not intended to be a broad grant of power to the trial court.

When the Advisory Committee began to draft the Federal Rules of Criminal Procedure a few years later, though, its expressed goal with respect to alternates was more clearly limited: to adopt a rule that would prevent mistrials necessitated by juror incapacitation.[47] Although the Committee began with a draft rule that was virtually identical to Civil Rule 47,[48] subsequent drafts of what then was denominated Criminal Rule 61(d) resembled the 1932 Alternate Jurors Act in that they explicitly conditioned the trial court's power to replace an empaneled juror with an

alternate. The drafters' principal concern was simply whether to delineate more precisely the conditions under which such substitutions could occur. Thus, an early iteration, Tentative Draft 2, read:

> If at any time after the regular panel and the alternate juror or jurors have been impanelled, a juror [should] die or become ill and therefore unable to perform his duty, or if a juror requests his discharge and shows to the satisfaction of the court his inability or disqualification to perform his duty, or if it is discovered by the court or by counsel or otherwise that a juror is legally disqualified to act, the court may order him to be discharged and may order an alternate juror in the precedence in which he was called to take the place in the jury of the juror discharged.[49]

The Committee on Style, examining this language, posited various other scenarios that might justify excusing a juror, such as "going to the army," the "death of a member of the [juror's] family," or a juror's wife's impending complicated childbirth.[50]

---

46. *See State v. Dolbow*, 117 N.J.L. 560, 189 A. 915, 917 (Err. & App.1937).

47. *See* Lester B. Orfield, *The Preliminary Draft of the Federal Rules of Criminal Procedure*, 22 Tex. L.Rev. 37, 65–66 & nn. 147, 149 (1943) [hereinafter Orfield, *Preliminary Draft*] (briefly explaining rule, and stating, "[t]he use of alternate jurors in such numbers as here permitted should often prevent a mistrial"); Lester B. Orfield, *Trial Jurors in Federal Criminal Cases*, 29 F.R.D. 43, 108 (1962) [hereinafter Orfield, *Trial Jurors*] (suggesting, per the Sixth Circuit in *Robinson*, 144 F.2d at 397, that the purpose of the Alternate Juror Act was "to prevent mistrials in criminal case of long duration where a juror dies or becomes so ill as to be unable to continue to perform his duties"); Wayne R. LaFave et al., *Criminal Procedure* § 22.3(e), at 158 (3d ed. 2007) ("To avoid this undesirable result [i.e. a mistrial], statutes and court rules have been adopted providing for the selection of alternate ... jurors....").

48. Orfield, *Trial Jurors*, *supra* note 47, at 44 (noting that "[a] single sentence was different" between the Civil Rule and the first draft of the Criminal Rule, pertaining to the time at which an alternate juror could be discharged).

49. Fed.R.Crim.P. 61(d), Tentative Draft 2 (Jan. 12, 1942), *in Records of the U.S. Judicial Conference: Committees on Rules of Practice and Procedures, 1935–1988, microformed on* CIS No. CM–2006–01 (Cong. Info. Serv.) [hereinafter *Committee Records*].

50. *See* Proceedings of the Advisory Committee on Rules for Criminal Procedure for the Supreme Court of the United States 1135–39, 1141 (Apr. 18–19 1942), *in Records of the U.S. Judicial Conference: Committees on Rules of Practice and Procedures, 1935–1988, microformed on* CIS No. CM–213 (Cong. Info. Serv.).

After further consideration, the drafters retreated; their fourth and subsequent tentative drafts provided simply that:

> If at any time prior to the return of the verdict a juror [should] die or become ill or otherwise unable to perform his duty, the court may order him to be discharged and may order an alternate juror in the precedence in which he was impaneled to take the place of the juror discharged.[51]

The First Preliminary Draft of the Rule, issued in May 1943, was identical.[52] Significantly, for present purposes, the Advisory Committee saw little substantive difference between the First Preliminary Draft of the Criminal Rule and Civil Rule 47(b). It noted:

> [Federal Rule of Civil Procedure] Rule 47(b) (Alternate Jurors) is more concise than the [Alternate Jurors Act] (28 U.S.C. § 417a). *The proposed rule follows as closely as possible Fed. Rules Civ. Proc., Rule 47(b), in the interest of uniformity of practice,* but there are two changes. The number of alternate

jurors authorized is increased.... The other change is that the court ... does not discharge the alternate juror until the regular jurors are discharged.[53]

In the Second Preliminary Draft, without explanation, the Committee returned to the phraseology of Civil Rule 47(b).[54] In doing so, it made three major changes from the First Preliminary Draft. First, the Second Preliminary Draft made alternate jurors the nominal subject of the rule, so that it stated what an "alternate juror[ ] ... shall" do, rather than what "the court may" do. Since no remarks were made about this change,[55] it appears to have been stylistic, not substantive—especially in light of the Committee's comment on the First Preliminary Draft that it wished to hew as closely as possible to the language of the Civil Rule.[56] Second, the Committee dropped the references to death and illness, realizing that it was superfluous to specify why a juror might be "unable" to perform his or her duties. Finally, the Committee added juror disqualification as a ground for substitution. That addition is unremarkable; more nota-

51. *See* Fed.R.Crim.P. 26(c), Tentative Draft 4 (May 18, 1942), *in Committee Records, supra* note 49; Fed.R.Crim.P. 22(c), Tentative Draft 6 (Winter 1942–43), *in Committee Records, supra* note 49.

52. *See* Fed.R.Crim.P. 22(c), Preliminary Draft 1 (May 1943), *in Committee Records, supra* note 49.

53. *See* Fed.R.Crim.P. 22, Note to Subdivision (c), Preliminary Draft 1, *supra* note 52 (emphasis added).

54. *See* Fed.R.Crim.P. 26(c), Preliminary Draft 2 (Feb. 1944), *in Committee Records, supra* note 49; Orfield, *Trial Jurors, supra* note 47, at 50.

55. *See* Fed.R.Crim.P. 26, Note to Subdivision (c), Preliminary Draft 2, *supra* note 54 (not noting change from First Preliminary Draft); George H. Dession, *The New Federal Rules of*

*Criminal Procedure: II,* 56 Yale L.J. 197, 227–28 (1947) (member of Advisory Committee discussing two differences between the Rule and the Alternate Juror Act—first, that the Rule permitted alternates to be used in cases prosecuted on information as well as indictment and that it allowed up to four alternates, rather than only two).

56. The Advisory Committee's explanatory note on the alternate juror provisions in the Second Preliminary Draft remained nearly identical to its notes on earlier drafts, despite the change in wording. Throughout the drafting process, the Advisory Committee indicated that it wished to follow Civil Rule 47(b) for uniformity of practice and because the Civil Rule was more concise than the Alternate Juror Act. *Compare* Fed.R.Crim.P. 26, Note to Subdivision (c), Preliminary Draft 2, *supra* note 54, *with* Fed.R.Crim.P. 22, Note to Subdivision (c), Preliminary Draft 1, *supra* note 52, *and with* Fed.R.Crim.P. 61 cmt., Tentative Draft 2, *supra* note 49.

ble is that the Committee evidently rejected various suggestions by district court judges to revise the Rule so as to permit courts "to excuse a juror for good cause shown," to "allow the trial court discretion in excusing regular jurors and replacing them with alternates," or to permit the use of alternates "in any case where the interest of justice requires it." [57] A fair inference is that the drafters (and the courts that reviewed and approved their handiwork) understood that the trial court's power to replace empaneled jurors with alternate jurors would be limited by the conditions set forth in the Rule. In the end, consistent with the wording of the counterpart Civil Rule, the drafters chose to state that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." [58]

Superior Court Criminal Rule 24(c) retains that language almost verbatim.[59] Consequently, we are guided in interpreting it by the history of the federal Rule and its subsequent construction by the federal courts.[60] The common-law and statutory background of Rule 24(c) and the chronicle of its drafting convince us that the Rule states a limit on the power of the trial court to remove jurors and replace them with alternates. The narrow purpose of the Rule is to enable courts to avoid mistrials by replacing incapacitated or disqualified jurors with alternates; it neither grants nor recognizes any broader removal authority, and courts have no inherent power to replace jurors for reasons other than the Rule specifies. That is how the United States Courts of Appeals have interpreted Federal Rule of Criminal Procedure 24(c)—its language grants limited authority to replace empaneled jurors and

---

**57.** *See* Orfield, *Trial Jurors, supra* note 47, at 49–50 (cataloguing comments on the First Preliminary Draft).

**58.** Fed.R.Crim.P. 24(c) (1960), *quoted in* Judicial Conference, *supra* note 43, at 520.

**59.** The differences in Superior Court Criminal Rule 24(c) are of no consequence to this case. First, the D.C. Rule is stylistically a little different. It uses the singular ("[a]n alternate juror ... shall") where the federal Rule uses the plural ("[a]lternate jurors ... shall"). It replaces the second-to-last word of the sentence, "their," with the word "juror." It also tightens up the language in the phrase requiring alternates to be used and sets that phrase off with commas.

In addition, the D.C. Rule was adopted after the 1966 amendments to the federal Rule, so it includes the clarification that an alternate juror can be used when an empaneled juror is "found to be" unable or disqualified, not only when she "becomes" so. This change was meant to deal with the situation where a juror's inability or disqualification to serve *should* have been discovered in voir dire but was not discovered until later. If the

Rule before the amendment were given an overly strict reading, that juror would not "become" unable or disqualified and could not be replaced with an alternate on that ground. In *United States v. Goldberg,* 330 F.2d 30 (3d Cir.1964), cited by the Advisory Committee in its note to the 1966 amendments, the trial court discovered during trial that a juror named Ida Robinson had responded by mistake to the jury clerk's call for Lottie Robinson. The trial court replaced Ms. Robinson with an alternate because she should not have been sworn in the first place (i.e., was disqualified). The Third Circuit rejected the defendant's argument that the substitution was erroneous because Ms. Robinson had not "become" disqualified. The change to the Rule approved that ruling.

Finally, like the federal Rule following its 1999 amendment, the D.C. Rule permits alternates to be retained during the deliberation period. (The Rules look less similar now, following a stylistic overhaul of the federal Rule in 2002.)

**60.** *See, e.g., (Nathaniel) Thomas v. United States,* 824 A.2d 26, 30 n. 6 (D.C.2003) (citing *Peddlers Square, Inc. v. Scheuermann,* 766 A.2d 551, 556 n. 4 (D.C.2001)).

thus constrains the trial court's discretion.[61]

■■■ For clarity's sake, we note that although Criminal Rule 24(c) is designed to allow courts to avoid mistrials, that does not mean it incorporates the exacting requirements for declaring a mistrial over the defendant's opposition. Any mistrial declared over the defendant's objection requires a demonstration of "manifest necessity."[62] We do not read Rule 24(c) as imposing such a stringent test; "[d]epriving a defendant of the entire jury panel and subjecting him to a new trial is by far a weightier decision than substituting one of the alternates for one of the empaneled jurors."[63] We think the drafters of Rule 24(c) contemplated a somewhat more flexible standard for such substitutions—as indicated by the various juror scenarios they considered—and that a degree of flexibility is appropriate precisely because the alternate juror remedy is designed to *avoid* mistrials. Thus, we think a trial court appropriately may find an empaneled juror "unable or disqualified to perform juror duties" under circumstances that might not amount to "manifest necessity" for a mistrial were an alternate juror unavailable—for example, where the court perceives a serious risk that the juror's ability to deliberate fully and fairly will be compromised because the juror faces financial hardship;[64] suffers health problems;[65] has inflexible travel plans;[66] cannot or will not pay adequate attention;[67] or the like.

**61.** See, e.g., *United States v. Merrill*, 513 F.3d 1293, 1308 (11th Cir.2008) ("[W]hen the district court replaced a juror with an alternate [inadvertently and] for no reason, it erred and violated Rule 24(c)."); *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir.1996) (interpreting Rule 24(c) as requiring "adequate cause" to replace a juror, including "a factual basis" supporting a "legally relevant reason," and finding no abuse of discretion where trial court used alternates to replace jurors who had conflicting holiday travel plans); *United States v. Donato*, 321 U.S.App. D.C. 287, 290, 99 F.3d 426, 429 (1996) (finding error where the trial court failed to explain why the dismissed juror was "unable or disqualified" to perform juror duties); *United States v. Gambino*, 951 F.2d 498, 502–03 (2d Cir.1991) ("Discretion ... is vested in the district court to remove a juror when the facts reveal that the juror's ability to perform her duties are impaired."). *But cf. United States v. Purdy*, 144 F.3d 241, 247 (2d Cir.1998) (stating that "[d]istrict courts ... have broad discretion under Federal Rule of Criminal Procedure 24(c) to replace a juror at any time before the jury retires if there is reasonable cause to do so," without stating that the rule limits what constitutes "reasonable cause"). The Supreme Court has not spoken on the issue.

**62.** *Sanchez v. United States*, 919 A.2d 1148, 1150–51 (D.C.2007) (quoting *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). The manifest necessity standard requires both the presence of extraordinary circumstances that would justify overriding the defendant's double jeopardy interests and the unavailability of any less drastic remedy that would allow the trial to continue to an impartial verdict. *Id.*

**63.** *United States v. Bonas*, 344 F.3d 945, 950 n. 6 (9th Cir.2003).

**64.** See, e.g., *United States v. Echavarria–Olarte*, 904 F.2d 1391, 1395 (9th Cir.1990) (assuming applicability of Rule 24(c) and finding no abuse of discretion in removal of juror who complained of financial hardship).

**65.** See, e.g., *United States v. Webster*, 162 F.3d 308, 345–46 (5th Cir.1998) (holding that trial court properly excused juror who was suffering severe pain following an automobile accident).

**66.** See, e.g., *Nelson*, 102 F.3d at 1349 (holding that trial court properly excused jurors who had holiday travel plans).

**67.** See, e.g., *Samad v. United States*, 812 A.2d 226, 230–32 (D.C.2002) (discussing propriety of excusing juror who has been asleep for a portion of the trial).

## B. Does the Defendant Have Standing to Object to a Rule 24(c) Violation?

We next examine whether a defendant has standing to object when the court replaces a juror in violation of Rule 24(c)—an inquiry that turns on whether the Rule protects the defendant's legitimate, legally recognized interests or rights in the context of a criminal case.[68] Although we have assumed that the defendant has standing in the past,[69] the government challenges that assumption, and so we examine the question afresh.

As we discussed in Section II.A.1, Rule 24(c)'s restrictions on the removal of empaneled jurors originated in the rule of practice developed at common law that a court could not discharge a juror without adequate cause.[70] This restriction on the court's power to remove jurors evolved early on (at least in the United States) into a right that defendants were entitled to assert in criminal cases [71]—the "valued right," as the Supreme Court eventually described it in *Crist*, to have the trial completed before a particular chosen jury.[72] Although the restriction originally was aimed at avoiding unnecessary mistrials, it was retained in Criminal Rule 24(c)

even though the availability of alternates decoupled the act of withdrawing a juror from the need to declare a mistrial. Moreover, Rule 24(c) did not purport to curtail the defendant's historically-established right to object to the unjustified removal of an empaneled juror.

That the limitation of judicial authority to remove empaneled jurors embodied in Rule 24(c) should continue to serve as a protection of the defendant in criminal cases is not surprising. Even with the remedial option of utilizing alternates to avoid mistrials, the same concerns that led courts to enforce the limitation in criminal prosecutions persist. For example, the replacement of even a single juror because the trial court fears he will vote to acquit the defendant would be as "odious, dangerous and unconstitutional" [73] as the discharge of the entire jury to avoid an acquittal. Consequently, the rule that a court cannot excuse an empaneled juror without adequate cause continues to function as a safeguard of the defendant's jury trial right recognized in *Crist*. More specifically, it serves to protect both the defendant's basic right to interpose a jury between his accuser and himself [74] and the

68. *See Rakas v. Illinois*, 439 U.S. 128, 132–34 & n. 2, 138–39, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (discussing standing in Fourth Amendment context, and stating, "the type of standing requirement discussed [in a previous case] and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine"); *cf. Keys v. United States*, 767 A.2d 255, 259–60 (D.C.2001) (explaining "the settled rule that a defendant ordinarily does not have standing to complain of an erroneous ruling on a witness's claim of privilege," even if the defendant is "adversely affected in fact" by the error).

69. *See, e.g., (Nathaniel) Thomas v. United States*, 824 A.2d 26, 30 (D.C.2003); *Darab v. United States*, 623 A.2d 127, 138 (D.C.1993).

70. *See supra* note 24.

71. *See supra* notes 28–33 & accompanying text.

72. *See Crist v. Bretz*, 437 U.S. 28, 36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).

73. *R v. Charlesworth*, (1861) 1 Best & Smith 460, 516, 121 Eng. Rep. 786, 807 (Q.B.) (opinion of Crompton, J.), *available at* http://www.commonlii.org/int/cases/EngR/1861/759.pdf.

74. *See Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (describing "the essential feature of a jury" as "the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of

defendant's right to a unanimous jury verdict.[75] It is well-settled that each of those rights "would be abrogated if it were permissible for the judge to intervene in deliberations and remove a juror for dissenting from the majority view." [76] That is equally true when a comparable judicial intervention takes place before deliberations begin. The possibility of such improper judicial intervention is not a fanciful one. Although jurors are instructed not to make up their minds as to how they will vote before the case is submitted to them,[77] they must and do make contemporaneous assessments of witnesses' credibility and begin to weigh and sift the evidence in their own minds. As arguably occurred with respect to Juror 8 in the present case, such preliminary thoughts and impressions could be revealed or indicated to the judge by questions the juror is permitted to submit for witnesses in the course of trial.

■ Like the unjustified declaration of a mistrial, the unjustified replacement of an empaneled juror may jeopardize the

defendant's rights regardless of the judge's precise motivation, and whether or not the judge is biased or acting in bad faith.[78] Wisely, Rule 24(c) therefore does not merely forbid the replacement of jurors on inappropriate grounds. Instead, the Rule protects the defendant's jury trial rights by specifying the only acceptable reasons for removal: incapacity and disqualification. The premise is that an empaneled juror, having passed voir dire examination and the parties' peremptory challenges, will serve to the end of trial unless compelling reasons require the juror's premature discharge. This approach, which adheres to the common-law rule, is prophylactic; it minimizes the chance that the trial court will, intentionally or unintentionally, place a judicial thumb on the scales by altering the jury's composition after it begins to hear the evidence.

Federal courts have not doubted that a defendant has standing to object if the trial court removes a juror in violation of

guilt or innocence"); *see also Crist*, 437 U.S. at 43–44, 98 S.Ct. 2156 (Powell, J., dissenting) (noting that the rule against needless discharges is one the Court "well might have come to regard as an aspect of due process if it had not been absorbed in this country by the Double Jeopardy Clause").

75. The right to a unanimous verdict in a criminal case is guaranteed both by rule, *see* Super. Ct.Crim. R. 31(a), and by the Sixth Amendment, *see Shotikare v. United States*, 779 A.2d 335, 344 (D.C.2001); *United States v. Essex*, 236 U.S.App. D.C. 166, 175, 734 F.2d 832, 841 (1984).

76. *Shotikare*, 779 A.2d at 344. "The juror in the minority must be afforded a full opportunity to persuade the majority. If consensus is not achievable and the jury hangs, that is a price that must be paid in order to keep the judicial thumb off the scales of a judgment that is constitutionally entrusted to the jury to make." *Id. See also United States v. Brown*, 262 U.S.App. D.C. 183, 188, 823 F.2d 591, 596 (1987) (explaining that if the trial court could dismiss a deliberating juror because the

juror favored the defense, "the right to a unanimous verdict would be illusory. A discharge of this kind would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case."); *Braxton v. United States*, 852 A.2d 941, 947 (D.C.2004).

77. *See Criminal Jury Instructions for the District of Columbia* § 1.03, at 10 (Barbara E. Bergman ed., 4th ed. rev. 2008); 1 Leonard B. Sand et al., *Modern Federal Jury Instructions—Criminal* ¶ 1.02, at 1–7, 1–8 (2008).

78. Thus, while we agree with the government's suggestion at oral argument that a judge who removes a juror specifically because the juror favored acquittal would display bias, an independent reason to set aside the defendant's conviction, that is beside the point. The jury trial rights at stake are distinct from the due process right to a fair and neutral tribunal.

the standard set forth in Federal Rule of Criminal Procedure 24(c). Of particular interest in this connection is the D.C. Circuit's textual examination of "the nature of Rule 24" in *Donato*.[79] "Rule 24 is carefully designed," the D.C. Circuit observes, "to provide defendants and the United States with a meaningful, if limited, say in the composition of the jury."[80] The Rule gives the parties a say in the selection of the jury through questioning of prospective jurors and the exercise of peremptory challenges, and respects their choice by "limit[ing] the use of alternate jurors to situations where regular jurors 'become or are found to be unable . . . to perform their duties.'"[81] The Rule's "grant of a say to the parties [would be] thwarted," the court reasoned, "if judges can, without any reason at all, change the composition of the jury."[82] "[U]nwilling to conclude that a right as important as this one is incapable of being vindicated on appeal," the court held that a convicted defendant who has preserved his objection to a Rule 24(c) violation is entitled to relief—reversal of his conviction—unless the court can find the violation harmless.[83]

■ The D.C. Circuit's approach reinforces our own analysis of the standing issue. We think it incontrovertible that Criminal Rule 24(c) recognizes and protects a criminal defendant's jury trial rights. Additionally, as *Donato* explains, the Rule grants defendants a "meaningful, if limited, say in the composition of the jury." We therefore hold that the defendant has standing to complain when he thinks the trial court has violated Rule 24(c) and reached beyond its circumscribed power to replace an empaneled juror with an alternate.

## C. Did the Trial Court Exercise Its Discretion Erroneously?

■ Having concluded that Criminal Rule 24(c) sets out an enforceable standard for the replacement of an empaneled juror with an alternate, and that the defendant has standing to invoke it, we turn to consider whether the trial court violated that standard when it removed Juror 8 over Hinton's objection. Recognizing the trial judge's "superior ability to observe the demeanor of the juror and [her] familiarity with the proceedings," our review is for abuse of discretion.[84] Deferring, for the moment, the question whether "abuse" requires a specific showing of prejudice in this context, the pertinent parameters of our review are well established. Briefly put, we will find that the trial court exercised its discretion erroneously if it replaced the juror for an improper or legally insufficient reason,[85] if its ruling lacked "a firm factual foundation,"[86] or if the trial court otherwise failed to "exercise its judgment in a rational and informed man-

---

79. *United States v. Donato*, 321 U.S.App. D.C. 287, 291, 99 F.3d 426, 430 (1996).

80. *Id.*

81. *Id.* (quoting Rule 24(c)).

82. *Id.*

83. *Id.*

84. *Darab v. United States*, 623 A.2d 127, 138 & n. 26 (D.C.1993); *accord, Donato*, 321 U.S.App.D.C. at 290, 99 F.3d at 429.

85. *See, e.g., Brown v. United States*, 766 A.2d 530, 538 (D.C.2001) ("A [trial] court by definition abuses its discretion when it makes an error of law." (quoting *Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (internal quotation marks omitted))).

86. *See Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979).

ner." [87] We will inquire whether the trial court "failed to consider a relevant factor [or] relied upon an improper factor, and whether the reasons given reasonably support the conclusion." [88] It is not our function, however, to second-guess a reasonable judgment of the trial court.[89]

### 1. Did the Removal of Juror 8 Violate Rule 24(c)?

 Although the trial judge did not advert explicitly to the criteria of Rule 24(c), the record satisfies us that the judge sought to apply the correct legal standard. We take it that in considering whether Juror 8 could "effectively deliberate with other jurors," whether his behavior was "strange and bizarre," and whether he adequately "th[ought] along the wavelength of normal functioning people," the judge was scrutinizing whether he had the capacity to continue to serve as a juror.[90]

 The record is inadequate to justify the judge's implicit finding that Juror 8 was "unable" to perform his juror duties, however. The judge expressly based her decision on the juror's written questions to the witnesses. Apart from those questions, the record is undeveloped, because the judge did not interview Juror 8 (or any other juror) in order to evaluate his fitness, and there is no other evidence that Juror 8 lacked the capacity to serve.[91] But as the panel concluded in *Hinton I*, the questions Juror 8 posed were "coherent and relevant"; and even if some of them "seemed unusual or immaterial, they were not indicative of an incapacity to follow and understand the evidence or to communicate and deliberate rationally and fairly with the other jurors." [92] The questions had a reasonable basis in the evidence, and they were not objectionable. Indeed, they focused, intelligently, on the central issue in dispute, the alleged connection between Hinton and the jacket in which the arresting officers claimed to have found PCP. The questions simply do not support a finding that Juror 8 was unable to perform his duties as a juror.

Although we do not doubt that the judge acted in good faith, the removal of a juror on account of his questions to witnesses comes perilously close to removing a juror because of his views of the evidence—one of the principal evils against which Rule 24(c)'s restrictions are directed. Indeed, that was the essence of defense counsel's objection to the removal of Juror 8 (whom

---

**87.** *Id.* at 365.

**88.** *Id.* (internal quotation marks and citation omitted).

**89.** *See, e.g., id.* at 363–64; *Ebron v. United States*, 838 A.2d 1140, 1152–53 (D.C.2003).

**90.** Evidence of a juror's seriously impaired cognitive functioning or seriously disruptive behavior is certainly adequate reason to conclude to the contrary. *See, e.g., Shotikare v. United States*, 779 A.2d 335, 345–46 (D.C. 2001) (upholding removal of a juror who verbally harassed and physically intimidated her colleagues); *United States v. Thomas*, 116 F.3d 606, 624 (2d Cir.1997) ("[W]e do not suggest, much less hold, that a juror's disruptive behavior—his reported 'hollering,' threatening to strike a fellow juror, or

feigned vomiting—could not serve as grounds for dismissal...."); *United States v. Fajardo*, 787 F.2d 1523, 1525–26 (11th Cir.1986) (holding that trial court did not abuse discretion in concluding that juror's sinus problems were so distracting and annoying to other jurors as to necessitate removal).

**91.** Neither the perceived exasperation of other jurors nor Juror 8's improper ex parte communication with the judge lends meaningful support to her decision to replace him. (The judge did not purport to rely on the ex parte contact.) The judge's characterization of the juror as "strange" is vague and unsubstantiated; no record was made of any troubling behavior on his part.

**92.** *Hinton v. United States (Hinton I)*, 951 A.2d 773, 779 (D.C.2008).

counsel perceived as receptive to his defense). This is therefore an area where a trial judge must proceed with great caution. Unless a juror's questions *unmistakably* reveal his incapacity, bias or other basis for disqualification—for instance, because their total irrelevance to the trial or incoherence indicate that the juror is delusional or otherwise unable to follow the proceedings—it is difficult to imagine that they could justify his removal.[93]

We conclude that the trial court exercised its discretion erroneously in this case by removing Juror 8 in violation of Criminal Rule 24(c).

### 2. Must the Defendant Show Prejudice from a Rule 24(c) Violation?

■ Having shown that the trial court violated Rule 24(c), must Hinton also demonstrate that he was prejudiced by the court's action to be entitled to relief? Numerous courts in other jurisdictions have required the defendant to show prejudice from a Rule 24(c) violation before finding that the trial court abused its discretion,[94] or, equivalently, have demanded that the defendant show he was prejudiced in connection with a harmlessness inquiry.[95] In *(Nathaniel) Thomas*, we followed those

93. Even if a juror's questions indicate incapacity, for example, further judicial inquiry—interviewing the juror in the presence of the parties—would be prudent, if not indeed mandatory, before the juror properly could be replaced.

94. *See United States v. Corsino*, 812 F.2d 26, 33 (1st Cir.1987) ("A trial court's exercise of this discretion is not to be disturbed absent a showing of bias or prejudice to the defendant." (internal quotation marks omitted)), *overruled in part on other grounds by United States v. Gonsalves*, 435 F.3d 64, 72 (1st Cir. 2006); *United States v. Purdy*, 144 F.3d 241, 247 (2d Cir.1998) ("District courts, however, have broad discretion under Federal Rule of Criminal Procedure 24(c) to replace a juror at any time before the jury retires if there is reasonable cause to do so, and a reviewing court will only find abuse of that discretion where there is bias or prejudice to the defendant." (internal quotation marks omitted)); *United States v. Virgen–Moreno*, 265 F.3d 276, 288 (5th Cir.2001) ("Unless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision."); *United States v. Cantu*, 229 F.3d 544, 549–50 (6th Cir.2000) (rejecting challenge because "[d]efendant has failed to demonstrate any prejudice to him resulting from the substitution of the alternate juror"); *United States v. Vega*, 72 F.3d 507, 512 (7th Cir.1995) ("[W]e will not overturn a conviction for a Rule 24(c) violation unless appellant can show prejudice."); *United States v. Brothers*, 438 F.3d 1068, 1072 (10th Cir.2006) ("[A] court's decision to replace a juror under Rule 24(c) is generally not reversible unless it resulted in prejudice to the defendant."); *United States v. De La Vega*, 913 F.2d 861, 869 (11th Cir.1990) ("This discretion [i.e. the decision to replace a juror with an alternate] is not to be disturbed absent a showing of bias or prejudice to the defendant or to any other party." (internal quotation marks and ellipsis omitted)); *State v. Lambert*, 175 Vt. 275, 830 A.2d 9, 13 (2003) ("That defendant here suffered no prejudice from the juror's dismissal—even if erroneous—is readily apparent."); *State v. Crisostomo*, 94 Hawai'i 282, 12 P.3d 873, 880 (2000) (after concluding that there was a "sound basis" for dismissing the juror, stating, "we must next examine whether Crisostomo was prejudiced by the trial court's decision to replace juror Luis with juror Madlener"); *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn.Crim.App.1991) ("One challenging the trial judge's decision ... has the burden of demonstrating how she was prejudiced by the seating of the alternate juror."); *see also State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985) (holding that trial court did not abuse discretion in substituting alternate for juror during deliberations because defendant could not show prejudice).

95. *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir.1996) ("A finding that a district court acted on an irrelevant legal basis or lacked factual support for the conclusion that a juror was unable or disqualified to perform his duty [and therefore replaced the juror with an alternate] amounts to a finding that the court abused its discretion. To obtain a

courts when, assuming that a juror had been removed in violation of Rule 24(c), we affirmed the appellant's conviction because he "presented no evidence whatever of prejudice." [96] The panel in *Hinton I*, bound by the holding of *(Nathaniel) Thomas*, was obliged to deny relief on this ground, though it expressed uncertainty as to its rationale.[97] In *Donato*, as the panel pointed out, the D.C. Circuit rejected the requirement that a defendant must show prejudice from a Rule 24(c) violation to prevail on his claim, opting instead to apply the usual harmless-error protocol of *Kotteakos v. United States* (under which the burden in criminal cases is on the beneficiary of an error to show that it was harmless).[98] We went en banc to reconsider the issue in light of *Donato*, and we are persuaded by several considerations to follow its lead.

First, the authorities that require the defendant to show prejudice are not as uniform as they appear—they differ in their definition of "prejudice." In *(Nathaniel) Thomas*, we held that a defendant could demonstrate prejudice only if, "as a result of the removal of [the impaneled juror]," a member of the defendant's jury "failed to conscientiously apply the law and find the facts." [99] Some other courts have taken the same tack.[100] Another line of authority, however, acknowledges that the requisite prejudice exists, and that no further showing of prejudice is required for reversal, whenever the trial court removes a juror (over defense objection) "without factual support or for a legally irrelevant reason." [101] In other words, these courts

---

new trial, however, the objecting party must nevertheless establish prejudice."); *United States v. Alexander*, 48 F.3d 1477, 1485 (9th Cir.1995) ("Because the defendants make no assertion that they suffered bias or prejudice, and do not claim that the alternate juror was not impartial, their convictions would not be subject to reversal even were we to conclude that dismissal of juror Ragsdale was an abuse of the district court's discretion." (internal quotation marks, brackets, and ellipsis omitted)); *State v. Brown*, 210 W.Va. 14, 552 S.E.2d 390, 397 (2001) ("[E]ven if this Court were to find that the trial court abused its discretion or erred in dismissing the tardy juror and replacing him with an alternate juror, the defendant has failed to show prejudice.").

**96.** *(Nathaniel) Thomas v. United States*, 824 A.2d 26, 31 (D.C.2003); *see also Darab v. United States*, 623 A.2d 127, 139 (D.C.1993).

**97.** *Hinton I*, 951 A.2d at 780–81 (noting that the court had not offered a rationale in *(Nathaniel) Thomas*).

**98.** *United States v. Donato*, 321 U.S.App. D.C. 287, 291, 99 F.3d 426, 430 (1996) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

**99.** *(Nathaniel) Thomas*, 824 A.2d at 30–31 (quoting *Tate v. United States*, 610 A.2d 237,

239 (D.C.1992) (internal quotation marks omitted)).

**100.** *See, e.g., Alexander*, 48 F.3d at 1485.

**101.** *See United States v. Purdy*, 144 F.3d 241, 247 (2d Cir.1998) (" 'Prejudice' in this context exists when the discharge is without factual support, or for a legally irrelevant reason." (internal quotation marks omitted)); *United States v. Virgen–Moreno*, 265 F.3d 276, 288 (5th Cir.2001) ("[W]e will find prejudice only if the juror was discharged without factual support or for a legally irrelevant reason." (internal quotation marks omitted)); *United States v. Puche*, 350 F.3d 1137, 1152 (11th Cir.2003) ("We review the exercise of … discretion to ensure that the District Court did not discharge the juror without factual support, or for a legally irrelevant reason so as to amount to a showing of bias or prejudice to the defendant." (internal quotation marks omitted)); *State v. Pease*, 222 Mont. 455, 724 P.2d 153, 163 (1986) ("Prejudice would include discharge of a juror for want of any factual support, or for a legally irrelevant reason." (internal quotation marks and brackets omitted)); *Johnson v. State*, 650 A.2d 1306, 1994 WL 496469, at *2, 1994 Del. Lexis 272, at *4 (Del. Sept. 6, 1994) (table decision, text in Westlaw or LEXIS) ("To show 'prejudice,' the defendant must show that the

have declared that if the trial court replaces an empaneled juror with an alternate in violation of Rule 24(c)'s conditions, prejudice to the defendant is presumed. In criminal matters, there is no difference between presuming prejudice whenever the trial court has erred and the usual harmless-error inquiry.[102]

Second, requiring Hinton to show specific prejudice is difficult to reconcile with the usual practice in criminal cases, in which preserved errors are deemed to be reversible unless the reviewing court is satisfied they are harmless.[103] To be sure, for certain assignments of error, we do require the defendant to demonstrate specific prejudice from the ruling in order to show that the trial court erred at all. But Rule 24(c) violations do not belong in that category. Although we have not always been clear about this, when we require a defendant to show specific prejudice as an aspect of error, as a rule it is (or should be) because

the defendant *also* must demonstrate prejudice to the trial court in order to be entitled to the ruling he desires. For example, a defendant may be entitled to severance "[i]f it appears that [he] ... is prejudiced by a joinder of offenses or of defendants." [104] Consequently, to prevail on a motion to sever, the defendant must show prejudice. If the motion is denied and the defendant raises the issue on appeal, he must convince us that he was prejudiced by the joinder—because if he was not, the trial court's ruling was correct.[105] Similarly, because a showing of prejudice is usually a precondition for winning relief from the trial court when a defendant seeks a continuance, he also must show prejudice to prevail on an appeal of that denial.[106] And where a defendant must establish "materiality" (which equates to the potential for prejudice) in the trial court to secure a favorable ruling, he likewise must show materiality on ap-

---

court's decision is based on a biased or legally irrelevant reason."); *see also State v. Cook*, 338 Md. 598, 659 A.2d 1313, 1324 (1995) ("Where, as in the instant case, a trial judge has excused a seated juror and replaced that juror with an alternate based on a proper reason that is particular to that specific juror and not based on the improper exclusion of a class of persons, we will give deference to this determination and will not reverse absent a clear abuse of discretion *or* prejudice." (emphasis added)).

**102.** *See infra* notes 126–128 & accompanying text. Somewhat similarly, in discussing whether, in general, the impact of an erroneous exercise of discretion warrants relief on appeal, we have said:

If the error in the discretionary determination jeopardized the fairness of the proceeding as a whole, or if the error had a possibly substantial impact upon the outcome, the case should be reversed. Similarly, if the court failed to undertake a required factual inquiry or if it ignored an apparent deficiency in the record, reversal is appropriate. Even though the specific harm of the error might not be cognizable, the failure to inquire for the record deeply enough

into the immediate problem suggests that the trial court did not exercise its judgment properly.... Further, if the trial court's decision is supported by improper reasons, reasons that are not founded in the record, or reasons which contravene the policies meant to guide the trial court's discretion or the purposes for which the determination was committed to the trial court's discretion, reversal likely is called for.

*Johnson v. United States*, 398 A.2d 354, 366–67 (D.C.1979) (citations omitted).

**103.** See our discussion of harmless error in Section III, *infra*.

**104.** Super. Ct.Crim. R. 14.

**105.** *See Reyes v. United States*, 933 A.2d 785, 794 (D.C.2007).

**106.** *See Kyle v. United States*, 759 A.2d 192, 196 n. 2 (D.C.2000) ("A party seeking a continuance must make a showing that it is 'reasonably necessary for a just determination of the cause,' including, at a minimum, some showing of prejudice in the absence of a continuance.") (citations omitted).

peal to establish that the denial of the ruling was error.[107] Rule 24(c), by contrast, does not require any showing of prejudice (or materiality) for its requirements to be applicable.

■ In support of a specific-prejudice requirement, the government argues that a mid-trial decision to replace an empaneled juror with an alternate is analogous to a decision to excuse a prospective juror in pretrial voir dire. We assumed the aptness of that comparison in *(Nathaniel) Thomas*.[108] But on closer examination, we think the two situations are not analogous. Voir dire "serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising

peremptory challenges."[109] Peremptory challenges, in turn, are themselves "auxiliary" in nature; they are granted "to help secure the constitutional guarantee of trial by an impartial jury."[110] Thus, what is ultimately at stake for the defendant when a juror is erroneously excused for cause in voir dire is the defendant's Sixth Amendment right to an impartial jury.[111] Ordinarily, the erroneous excusal of a prospective juror for cause can have no adverse effect on the impartiality of the chosen jury or the defendant's rights, for it "cannot cause the seating of a biased juror."[112] All the empaneled jurors, having been "vetted for cause ... [are], by definition, fair and impartial."[113] Since a defendant

---

**107.** For instance, where evidence in the government's possession is discoverable if it is "material to the preparation of the defense," Super. Ct.Crim. R. 16(a)(1)(D), a defendant claiming that the trial court erred in denying discovery must show materiality on appeal as well as in the trial court. *See Jackson v. United States*, 768 A.2d 580, 583–84 (D.C. 2001).

**108.** *See (Nathaniel) Thomas v. United States*, 824 A.2d 26, 31 (D.C.2003) (citing *Tate v. United States*, 610 A.2d 237, 239 (D.C.1992), a voir dire case, for the proposition that the appellant must show that as a result of the juror's erroneous replacement with an alternate, "an impaneled juror failed to conscientiously apply the law and find the facts").

**109.** *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991).

**110.** *United States v. Martinez–Salazar*, 528 U.S. 304, 311, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). "[U]nlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension." *Id.* at 311, 120 S.Ct. 774.

**111.** The right to an impartial jury is also a component of due process. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent

jurors.... A fair trial in a fair tribunal is a basic requirement of due process." (internal quotation marks omitted)).

**112.** *State v. Sanders*, 92 Ohio St.3d 245, 750 N.E.2d 90, 104 (2001); *see, e.g., Tate*, 610 A.2d at 239. There are exceptions to this generalization. For example, where venire members are targeted for exclusion based on their views, it may unacceptably skew the jury in favor of one side. *See, e.g., Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction"). If prospective jurors are excluded on the basis of constitutionally impermissible criteria, such as race, ethnicity or gender, that too may taint the jury. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 86–87, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (holding that exclusion of jurors based on race requires reversal because it violates the "defendant's right of equal protection," "unconstitutionally discriminate[s] against the excluded juror," and "undermine[s] public confidence in the fairness of our system of justice").

**113.** William T. Pizzi & Morris B. Hoffman, *Jury Selection Errors on Appeal*, 38 Am.Crim. L.Rev. 1391, 1433 (2001).

generally "has no right to have any particular person sit on the jury"[114] so long as the defendant's Sixth Amendment right to an impartial jury is preserved, it makes sense that a defendant complaining on appeal of the erroneous excusal for cause of a prospective juror should have to show prejudice—specifically, as we said in *Tate*, that as a result of the error, an empaneled juror "failed to conscientiously apply the law and find the facts."[115] In effect, the burden of persuasion with respect to prejudice, normally on the government, is shifted to the appellant because the record of the voir dire shows affirmatively that the error was "cured" by the selection of an impartial juror.

But that is not necessarily so with respect to erroneous mid-trial removals of empaneled jurors. Once they start hearing and considering the evidence, individual jurors may evaluate it differently, and they may no longer be viewed as fungible merely because they have passed muster in voir dire. At that point, more than just the defendant's right to an impartial jury is at stake when the judge erroneously replaces a juror with an alternate. Then, as explained above, such an error also may threaten the independence of the jury's decision-making from undue judicial influence and the defendant's basic rights to trial by jury and a unanimous verdict—

threats that we have concluded Rule 24(c) is intended to prevent.[116] This is not to say that the erroneous replacement of an empaneled juror can never be found harmless—a matter we discuss below, in Section III—only that the impartiality of the substituting alternate and the resulting jury does not, by itself, necessarily dispose of the issue.

■ As a practical matter, while the erroneous mid-trial replacement of an empaneled juror with an alternate may jeopardize the defendant's substantial right to have his fate determined by the unanimous verdict of a jury free of undue judicial influence, "in most cases, it will be difficult to prove specific prejudice stemming from a Rule 24(c) violation."[117] That may be an understatement; the *Donato* court opined that "[i]t will nearly always be impossible . . . for a defendant to show prejudice from a violation of [Federal] Rule 24(c)."[118] This constitutes a serious objection, as the D.C. Circuit explained:

> If the government is correct that an appellant alleging a Rule 24(c) violation must show a specific prejudice from that violation, then Rule 24(c) would be entirely precatory. We are unwilling to conclude that a right as important as this one is incapable of being vindicated on appeal.[119]

114. *Sanders*, 750 N.E.2d at 104; *see also* 6 LaFave, *supra* note 47, § 22.3(c), at 116–17.

115. *Tate*, 610 A.2d at 239; *see also Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[T]he quest [in voir dire] is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of. . . .").

116. Indeed, Rule 24(c)'s preventative purpose would be nullified if we adopted the *(Nathaniel) Thomas* panel's approach to prejudice. Under that approach, relief is only available when a biased juror participated in the defendant's trial—and the participation of a biased

juror violates the due process clause, so the defendant would have been entitled to relief anyway. *See Wainwright*, 469 U.S. at 423, 105 S.Ct. 844; *Irvin*, 366 U.S. at 722, 81 S.Ct. 1639 (defining absence of biased juror as aspect of due process). Rule 24(c) is not merely coextensive with due process.

117. *(Nathaniel) Thomas v. United States*, 824 A.2d 26, 30 n. 8 (D.C.2003).

118. *United States v. Donato*, 321 U.S.App. D.C. 287, 291, 99 F.3d 426, 431 (1996).

119. *Id.*

We agree. Ordinarily, when this court determines that the trial court erred in a criminal case and that the error was preserved by a timely and appropriate objection, the burden is not on the appellant to show prejudice in order to obtain relief. Rather, we will grant relief—reverse the judgment on appeal—unless we are convinced the error was harmless. There are sound reasons to adhere to that general rule, and no good reason to depart from it, when the trial court has jeopardized a defendant's basic jury trial rights by erroneously replacing an empaneled juror with an alternate in violation of Rule 24(c).[120] The holding of *(Nathaniel) Thomas* that a defendant must demonstrate he had a biased jury in order to obtain relief on appeal because of a Rule 24(c) violation is hereby overruled.

### III. Was the Error Harmless?

 Hinton having preserved his objection, we come now to the question whether we can deem the Rule 24(c) violation in this case to have been harmless.[121] We apply the standard test applicable to non-constitutional errors, for though Rule 24(c) safeguards constitutional rights, the failure to comply with its requirements is not a constitutional violation in itself.[122] In order to conclude that a non-constitutional error was harmless, we must be able to "say, with fair assurance, after pondering

**120.** There is an additional reason not to require a showing of prejudice. A juror who is excused arbitrarily has been denied a key right of citizenship—the right to sit on a jury. *See Powers v. Ohio*, 499 U.S. 400, 407, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ("[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."). While a juror removed in erroneous good faith does not suffer the "humiliation" of discrimination, *cf. id.* at 413–14, 111 S.Ct. 1364, she would still bear the indignity of the implication that she could not help decide the case fairly. Bringing suit over an erroneous removal would be difficult, if not impossible. *See id.* at 414–15, 111 S.Ct. 1364. By permitting the defendant to object, and to demonstrate error without showing specific prejudice stemming from the trial court's ruling, we effectively permit the defendant to assert the juror's rights. *Cf. id.* at 411, 111 S.Ct. 1364 (discussing and resting holding on jus tertii standing).

**121.** *See* D.C.Code § 11–721(e) (2001) (directing the Court of Appeals to render judgment in any appeal "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* Super. Ct. Crim. R. 52(a) ("*Harmless error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

**122.** *See Donato*, 321 U.S.App.D.C. at 291, 99 F.3d at 431. Accordingly, we do not apply the stricter standard applicable to errors of constitutional magnitude. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

Hinton does not argue that a Rule 24(c) violation is a "structural" error that never can be harmless. A unanimous Supreme Court recently has said that "we typically designate an error as structural, therefore requiring automatic reversal, *only* when the error *necessarily* renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Rivera v. Illinois*, — U.S. —, —, 129 S.Ct. 1446, 1455, 173 L.Ed.2d 320 (2009) (emphasis added; internal quotation marks and brackets omitted). On its face, like the mistaken rejection of a defendant's peremptory challenge of a potential juror at issue in *Rivera*, the mistaken replacement of a juror with an alternate "does not … constitute an error of that character." *Id.* But see *United States v. Gonzalez–Lopez*, 548 U.S. 140, 149 n. 4, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (declaring that class of structural errors is not limited "*only* [to] those errors that *always* or *necessarily* render a trial fundamentally unfair and unreliable," because errors also may be deemed structural based on "the difficulty of assessing the effect of the error" and "the irrelevance of harmlessness").

all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." [123] If the error had a "substantial influence" on the outcome, or if we are "left in grave doubt" as to whether it did, "the conviction cannot stand." [124] Under this standard, the "burden" is not on the appellant to show that he has suffered prejudice; rather, the issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision.[125] Thus, "when a court is in virtual equipoise as to the harmlessness of the error ..., the court should treat the error ... as if it affected the verdict." [126] If we are to speak, somewhat loosely perhaps,[127] in terms of burdens of persuasion, then we may say that the government bears the "burden of showing the absence of prejudice." [128]

In *Hinton I,* the panel commented that "[j]ust as a defendant will rarely be able to demonstrate prejudice from the replacement of a juror for insufficiently supported or improper reasons, the government will rarely be able to demonstrate that such an error was harmless." [129] On reflection, we must retreat somewhat from that assertion. In many cases, where twelve impartial jurors have voted unanimously to find the defendant guilty beyond a reasonable doubt, we might be persuaded that the erroneously removed thirteenth juror would not have viewed the evidence differently. Thus, for example, we would suppose that if the government's case is strong and there is no reason apparent in the record to think the erroneously removed juror would have dissented, a reviewing court could be satisfied that the juror substitution had no substantial influ-

123. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

124. *Id.*

125. *See O'Neal v. McAninch,* 513 U.S. 432, 436–40, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

126. *Fry v. Pliler,* 551 U.S. 112, 121 n. 3, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (internal quotation marks omitted).

127. The Supreme Court cautioned against this approach in *O'Neal,* 513 U.S. at 436–37, 115 S.Ct. 992:

 [W]e deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of "burden of proof." The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens

 (*e.g.,* "Do I believe the party has borne its burden of showing ...?").

128. *United States v. Olano,* 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *see also id.* at 734, 113 S.Ct. 1770. The Supreme Court recently elaborated on the government's burden of persuasion with respect to harmless error in criminal cases as follows:

 [W]e have placed such a burden on the appellee only when the matter underlying review was criminal. In criminal cases the Government seeks to deprive an individual of his liberty, thereby providing a good reason to require the Government to explain why an error should not upset the trial court's determination. And the fact that the Government must prove its case beyond a reasonable doubt justifies a rule that makes it more difficult for the reviewing court to find that an error did not affect the outcome of a case. See [*Olano,* 507 U.S. at 741, 113 S.Ct. 1770] (stating that the Government bears the "burden of showing the absence of prejudice").

 *Shinseki v. Sanders,* —— U.S. ——, ——, 129 S.Ct. 1696, 1706, 173 L.Ed.2d 532 (2009).

129. *Hinton v. United States (Hinton I),* 951 A.2d 773, 781 (D.C.2008).

ence on the outcome.[130]

■ But this is not such a case. There was a real dispute in the evidence as to Hinton's possession of the PCP. The police testified they seized it from the jacket Hinton was wearing, while the civilian witnesses denied Hinton was wearing any jacket or that the police recovered any drugs from him. The photographs of Hinton taken when he was arrested did not show him wearing a jacket. Moreover, because the jurors here were allowed to submit questions for the witnesses, we have some information concerning the removed juror's thoughts about the evidence. It is fair to say that Juror 8's pointed, probing inquiries, most of which focused on the absence of a jacket in Hinton's photograph, evinced skepticism of the police testimony. The juror's persistence in asking these questions supports the inference that the officers' answers failed to satisfy him. (That, evidently, was defense counsel's perception at trial.) If so, of course, the defense witnesses' testimony reinforced the juror's leanings. To be sure, we cannot know Juror 8's mind for certain; that he was testing the government's evidence does not necessarily mean he disbelieved it. And even if he disbelieved it, his mind might have been changed in deliberations with his fellow jurors. The opposite is also true, however: there is a real likelihood that Juror 8 would have voted to acquit Hinton, either hanging the jury or, perhaps, even persuading his fellow jurors to join him.

We cannot know what would have happened—and that is the problem.

Our "grave doubts" as to whether the removal of Juror 8 influenced the verdict are not assuaged. We cannot say with the necessary "fair assurance" that absent the error, all twelve members of Hinton's jury would have voted to convict him.[131]

### IV. Conclusion

For the foregoing reasons, we hold that the trial court's erroneous removal of an empaneled juror in violation of Criminal Rule 24(c) constituted an abuse of discretion [132] and thus entitles Hinton to a new trial on the felony count of possession of PCP with intent to distribute.

*Reversed.*

---

130. Where the prosecution case is less than overwhelming, however, increasing the probability that the replaced juror fairly might have had a reasonable doubt of the defendant's guilt, we would be more cautious about finding harmlessness merely because the record offers no insight into the replaced juror's views of the evidence. The closer the case, the more difficult it becomes for a court to dismiss the removal of a juror as harmless. How far the trial had progressed when the juror was removed also may have a bearing on the harmlessness inquiry, though as the issue is not presented here, we express no definitive view on that possibility.

131. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

132. *Johnson v. United States*, 398 A.2d 354, 367 (D.C.1979).