*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 20-FM-0739, 20-FM-0740, 21-FM-0068, 21-FM-0069 & 21-FM-0127

ASLI CAROME, APPELLANT/CROSS-APPELLEE,

v.

PATRICK CAROME, APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(2018-DRB-001768)

(Hon. William W. Nooter, Trial Judge)

(Argued February 8, 2023                          Decided May 11, 2023)

*Ayesha N. Khan* for appellant/cross-appellee.

*Steven P. Lehotsky* for appellee/cross-appellant.

Before BECKWITH and MCLEESE, *Associate Judges*, and GLICKMAN, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant/cross-appellee Asli Carome and appellee/cross-appellant Patrick Carome challenge several rulings by the trial court relating to the interpretation of a premarital agreement. We affirm in part, reverse in part, and remand the case for further proceedings.

## I.  Background

The following facts appear to be undisputed for current purposes.  The parties were married in 2010.  They each entered the marriage with significant assets.  Ms. Carome initially took care of the parties' children from prior marriages, but she obtained a position as an attorney with the federal government in 2012.  Mr. Carome was a partner at a private law firm throughout the marriage, earning over one million dollars a year.

The parties entered into a premarital agreement to govern the treatment of their assets before, during, and after the marriage.  With specified exceptions, the agreement requires the parties to pay their earnings during the marriage into a joint marital account.  The parties contributed to a joint account pursuant to the agreement until September 2013, when Mr. Carome closed the account.

The parties formally separated in November 2017.  Ms. Carome subsequently filed a petition for divorce, and Mr. Carome filed a counter-petition.  The trial court issued a divorce decree and resolved numerous contested issues.  The present appeals focus entirely on claims relating to the premarital agreement.

After a bench trial, the trial court concluded that Mr. Carome had breached the premarital agreement by failing to deposit earnings into the joint account between 2013 and the parties' separation in 2017. Both parties introduced expert testimony regarding the amount of the underpayment by Mr. Carome. The trial court ultimately awarded Ms. Carome more than $440,000 in damages.

## II. Earnings "During the Marriage"

As previously noted, the premarital agreement generally requires the parties to contribute their earnings to a joint account "during the marriage." Agreement §§ 1.5, 1.7. Specifically, § 1.7(A) of the agreement provides, in relevant part:

> Each party agrees that he or she shall transfer to a Marital Account the entire portion (if any) of his or her earnings acquired during the marriage which is not applied towards or otherwise set aside to satisfy the obligations and arrangements described in items (i) through (vii) of this Paragraph A.

The parties dispute the meaning of the phrase "during the marriage" in that provision. Ms. Carome argues that the phrase should be interpreted to mean until the date of divorce, so that Mr. Carome was obliged to make contributions to the

joint account until the divorce. Mr. Carome argues that the phrase should be interpreted to mean until the date of separation.

Noting that neither party had sought consideration of extrinsic evidence, the trial court ruled as a matter of law that "during the marriage" under § 1.7(A) does not include the period after the parties' separation.

We review de novo the trial court's interpretation of the phrase "during the marriage" in § 1.7(A). *See, e.g.*, *Abdelrhman v. Ackerman*, 76 A.3d 883, 887-88 (D.C. 2013) (Where extrinsic evidence is not at issue, "[t]he proper interpretation of a contract . . . is a legal question, which this court reviews de novo.") (italics and internal quotation marks omitted). Our task is to "determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (internal quotation marks omitted). We "look[] to the entire language of the agreement, not merely a portion thereof," and we consider "the customary, ordinary and accepted meaning of the language used." *James G. Davis Constr. Corp. v. HRGM Corp.*, 147 A.3d 332, 340 (D.C. 2016) (internal quotation marks omitted).

Although the agreement is not entirely clear on the point, we agree with the trial court that the agreement is better read to establish the date of separation as the end point of the parties' obligation to contribute earnings to the joint account.

We acknowledge that a number of considerations support Ms. Carome's contrary interpretation. First, in ordinary language, marriage is understood to end at the moment of divorce, not at the moment of separation. *Compare, e.g.*, *Divorce*, *Webster's Third New Int'l Dictionary* 664 (2002) ("1: a legal dissolution in whole or in part of a marriage relation . . ."), *with, e.g.*, *Separation*, *id.* at 2070 ("4a(1): cessation of cohabitation between husband and wife by mutual agreement"). Second, the ordinary legal understanding is the same. *See Divorce*, *Black's Law Dictionary* 582 (10th ed. 2014) ("The legal ending of a marriage . . . ."); *Separation*, *id.* at 1572 ("1. An arrangement whereby a husband and wife live apart from each other while remaining married . . . ."); *see also* D.C. Code § 16-920 (final decree of divorce dissolves bonds of matrimony); *Powell v. Powell*, 457 A.2d 391, 393 (D.C. 1983) (approving trial court's treatment of property acquired after separation and before divorce as property acquired "during the marriage"). Third, several other provisions of the agreement seem to indicate that marriage under the agreement continued after separation. *See, e.g.*, Agreement § 3.2(A) (requiring parties to

designate each other as survivor beneficiary of portions of retirement plans derived from contributions made "during the marriage and before separation").

In our view, however, those considerations are outweighed by strong indications to the contrary that the obligation to contribute to the joint account ends at the point of separation. First, Recital H to the agreement refers to separation as a form of "dissolution of the[] marriage." Agreement Recital H. The agreement expressly incorporates the recitals, which therefore are an operative part of the agreement. *See* Agreement § 12.16 ("The Recitals set forth above are hereby incorporated by reference as part of this Agreement."); *Goldman v. Lustig*, 237 So. 3d 381, 384 n.2 (Fla. Dist. Ct. App. 2018) (recitals incorporated into agreement are binding); *First Bank & Tr. Co. of Ill. v. Vill. of Orland Hills*, 787 N.E.2d 300, 308 (Ill. App. Ct. 2003) ("[P]reliminary recitals in [an] agreement of themselves are not binding unless referred to in [the] operative portion of [the] agreement [so] as to show a design that they should form a part of it[.]") (brackets and internal quotation marks omitted); *cf. Trilon Plaza, Inc. v. Comptroller of N.Y.*, 788 A.2d 146, 151 (D.C. 2001) (rejecting argument that recital "can never be treated as an operative part of a contract") (internal quotation marks omitted). Recital H clearly treats separation as the end of the marriage.

Second, Recital F to the agreement describes the parties as "self-supporting" and states that the parties "desire to waive any rights or claims to support from the other in the event of a separation or divorce." Agreement Recital F. That provision undermines the theory that the parties would be obliged to continue contributing to a joint account during a period of separation.

Third, various other provisions in the agreement appear to indicate that marriage for purposes of the agreement ended at the moment of separation. *See, e.g.*, Agreement § 2.4(E) (successor home may be sold during marriage or "disposed of upon a separation or divorce").

Fourth, the agreement in a number of places draws the line between marital property and separate property by focusing on the date of separation rather than the date of the divorce. *See, e.g.*, Agreement § 1.5(iv)-(v) (certain retirement benefits attributable to contributions from date of marriage until separation are marital property); *id.* § 1.6(ii) (retirement benefits earned after separation are separate property). Those provisions support the view that money earned after separation should not be viewed as marital property to be contributed to a joint account.

Finally, the agreement provides that separation triggers the obligation to divide marital property, and the value of the marital property is to be assessed as of the date of separation. *See* Agreement § 5.2(A) ("In the event of the parties' separation, the parties' marital property shall be disposed of . . . ," and "[e]ach party shall receive one-half of the net value of all marital property owned by the parties as of the date of separation."). That provision strongly undermines the idea that the parties would continue creating substantial amounts of new marital property after the date of separation, particularly given that the agreement contains no direction about how to divide such post-separation marital property.

The foregoing considerations on both sides lead us to the following conclusions. The agreement is not carefully drafted, and it is internally inconsistent on the general question whether the marriage should be understood to end at the moment of separation or at the moment of divorce. The answer to that question under the agreement might well vary depending on the specific provisions at issue. Focusing on the provisions most directly at issue here, however, we agree with the trial court that the agreement is better understood to establish separation as the end point of the obligation to contribute to the joint account.

We are not persuaded by Ms. Carome's additional arguments to the contrary. First, Ms. Carome refers in passing to extrinsic evidence concerning the interpretation of the agreement. The trial court ruled, however, that neither party had asked the court to consider extrinsic evidence in interpreting the contract. Ms. Carome has not challenged that ruling in this court. We therefore decline to consider extrinsic evidence.

Second, Ms. Carome argues that the phrase "during the marriage" must be given the meaning that phrase is given in District of Columbia statutes and the decisions of this court. We disagree. It is true that the agreement provides that the "interpretation of th[e] [a]greement shall be determined and governed by the laws of the District of Columbia." Agreement § 12.13. The law of the District of Columbia, however, is that terms in a contract ordinarily should be interpreted based on the wording of the contract and applicable principles of contract interpretation, not simply by relying on definitions that can be found in a statute or a decision of this court. *See generally, e.g.*, *Convit v. Wilson*, 980 A.2d 1104, 1114-15 (D.C. 2009) (when interpreting contract, court follows "established rules of contract interpretation," looking first to language of contract) (internal quotation marks omitted). To be clear, we agree with Ms. Carome that definitions of the phrase "during the marriage" in statutes and the decisions of this court are relevant. *See,*

*e.g.*, *Parker v. U.S. Tr. Co.*, 30 A.3d 147, 152 (D.C. 2011) (stating that where contract provided that it would be interpreted in accordance with laws of District of Columbia, argument that contractual term should be given statutory definition has "some force and is, at a minimum, reasonable"); *Morgenstern v. Nationwide Agribusiness Ins. Co.*, 78 F. App'x 485, 491 (6th Cir. 2003) ("[S]tatutory definitions can be relevant in construing a contract . . . ."). We do not, however, view such definitions as necessarily dispositive, at least in the absence of contractual language explicitly adopting a particular definition taken from statute or case law. *Cf., e.g., Ins. Co. of N. Am. v. Godwin*, 361 N.Y.S.2d 461, 464 (App. Div. 1974) ("[W]e are here interpreting a policy of insurance, and [the insured] is entitled to have it construed as a contract and not necessarily according to the statutory definition."). For the reasons we have stated, we do not find the definition of "during the marriage" in statute and case law to be dispositive in this case.

Finally, Ms. Carome argues that ambiguities in the agreement should "be construed strongly against the drafter," who was Mr. Carome. *Intercounty Constr. Co. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982) (internal quotation marks omitted). That consideration favors Ms. Carome, but we do not view the consideration as determinative. The rule disfavoring the drafter of an agreement comes into play only if other principles of contract interpretation leave the court

unable to give the contractual language at issue a definite meaning. *See id.* (explaining that if, after court attempts to determine what reasonable person would have thought contract meant, "a contract and its terms are still not subject to one definite meaning, the ambiguities remaining in the contract will be construed strongly against the drafter") (citation and internal quotation marks omitted); *see also Am. Bldg. Maint. Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 863 (D.C. 1995) (canon of construction disfavoring drafter of agreement "is a secondary standard of interpretation . . . inferior to . . . other authority revealing [the parties'] understanding") (internal quotation marks omitted). For the reasons we have explained, we conclude that the agreement, read as a whole, can be given a definite interpretation.

In sum, we affirm the trial court's ruling that Mr. Carome was not required by the agreement to contribute to the joint account after the parties separated in November 2017.

### III. Payments to Defined-Benefit Retirement Plan

As previously mentioned, the agreement provides for exceptions to the parties' obligation to contribute their earnings to the joint account. Agreement

§ 1.7(A).  One of those exceptions is for "contributions to retirement plans or accounts."  *Id.* § 1.7(A)(iii).  That exception is limited, however, by § 1.7(D), which caps such deductions for a given year to a percentage of the amount that the party contributed to the joint account that year.  *Id.* § 1.7(D) ("During the marriage, the total amount of current earnings that either party may contribute in any calendar year to retirement plans or accounts shall not exceed . . . one-half (50%) of the total amount that he or she contributes from current earnings to Marital Accounts during the same calendar year.").

Relying on those provisions, Ms. Carome argues that Mr. Carome could not properly deduct any amounts relating to retirement contributions in years in which Mr. Carome did not pay any earnings into the joint account.  To put the point mathematically, Ms. Carome argues that 50% of $0 = $0.

Mr. Carome does not dispute that argument with respect to some retirement payments, such as payments to his 401(k) retirement plan.  Mr. Carome does dispute that argument, however, with respect to payments into his law-firm defined-benefit retirement plan.  Mr. Carome makes two principal points.  First, he argues that his defined-benefit plan is separate property under the agreement.  *See* Agreement § 1.6(iii) (Mr. Carome's defined-benefit plan and certain other retirement plans are

separate property, "notwithstanding that [Mr. Carome] may make contributions to such plans or accounts during the marriage from his earnings"). Second, he argues that he did not make contributions to the defined-benefit plan, but rather his law firm did. The trial court ruled for Mr. Carome on this issue. We review that ruling de novo, *Abdelrhman*, 76 A.3d at 887-88, and we come to a contrary conclusion.

It is true that Mr. Carome's defined-benefit plan is separate property under the agreement. Agreement § 1.6(iii). That is an entirely separate question, however, from the question whether Mr. Carome was entitled under the agreement to a deduction from his earnings for payments made into the defined-benefit plan. The latter question is governed by § 1.7(D) of the agreement, which places a cap on the amount that can be deducted from earnings for "contributions to retirement plans." *Id.* § 1.7(D). Nothing in the language of that provision suggests that the cap is limited to retirement-plan payments that are marital property rather than separate property. *Cf. id.* § 1.7(A)(iii) (acknowledging that parties may use earnings to satisfy separate obligations, including, "*except as limited in Section 1.7(D),* contributions to retirement plans") (emphasis added). To the contrary, as Mr. Carome acknowledges, the obvious purpose of the cap is to limit the amount of income a party can shelter in a given year from the obligation to make contributions to the joint marital account. That purpose applies equally to all retirement payments,

whether those payments went to retirement accounts that would be marital property or to retirement accounts that would be separate property.

Mr. Carome does not dispute that the payments into the defined-benefit plan came from his earnings. Thus, the sole remaining issue is whether those payments were "contributions" within the meaning of § 1.7(D) of the agreement. We conclude that the payments were contributions. Section 1.6(iii) of the agreement implies as much, stating that Mr. Carome "may make contributions to such plans or accounts [including the defined-benefit plan] during the marriage from his earnings." Agreement § 1.6(iii). Section 3.2(A) of the agreement is clearer on the point, providing that during the marriage Mr. Carome was obliged to name Ms. Carome as the survivor beneficiary of all portions of the defined-benefit plan "derived from contributions of earnings that [Mr. Carome] made during the marriage and before separation." *Id.* § 3.2(A). Those provisions of the agreement in our view make clear that payments to the defined-benefit plan were understood to be contributions.

We are not persuaded by Mr. Carome's arguments to the contrary. Mr. Carome argues that the defined-benefit payments were mandatory, but nothing in the language or logic of § 1.7(D) turns on whether Mr. Carome could unilaterally determine the amount of the payment at issue. Mr. Carome also argues that

payments to the defined-benefit plan were directly implemented by his law firm, rather than through transactions that Mr. Carome himself made. We are unconvinced by that distinction. It is undisputed that the payments were from Mr. Carome's earnings and went to his defined-benefit plan. We do not see why it is relevant that the law firm automatically conducted those transactions on Mr. Carome's behalf.

Accordingly, we reverse the trial court's ruling permitting Mr. Carome to deduct payments to the defined-benefit plan during the years when Mr. Carome failed to make required payments into the joint account. We remand for further proceedings to revise the damages award accordingly.

## IV. 2017 Partnership Compensation

The parties separated in November 2017. They dispute whether, under the agreement, Mr. Carome's earnings during the marriage should include a prorated amount of the compensation Mr. Carome received from his law firm for that year. Mr. Carome argues that his law firm's profits were "speculative and contingent" until after the end of 2017, and thus Mr. Carome did not earn anything "concrete[]" between January and November 2017, except for the right to a share of the firm's

profits paid out after the end of 2017, by which time the parties had separated. Mr. Carome therefore contends that all of his 2017 compensation should be treated as separate property under the agreement.

The trial court concluded that Mr. Carome's earnings from his law firm from January to November 2017, even if not known in their exact amount at the time of separation, were marital property under § 1.3 of the agreement, which includes "accrued but unpaid compensation" in the definition of "earnings." Agreement § 1.3; *see also id.* § 1.7(A) (requiring parties to transfer earnings to marital account, subject to exceptions). In support of that ruling, the trial court pointed out that the agreement treats a prorated estimate of Mr. Carome's 2010 law-firm compensation as having accrued in July 2010 and thus as being a premarital asset rather than a marital asset. *See* Agreement, Exh. B, at 2-3 n.16 (treating "[v]ery rough estimate" of prorated 2010 law-firm compensation as "pre-marital asset"). We review the trial court's ruling de novo, *Abdelrhman*, 76 A.3d at 887-88, and we affirm.

Whatever meaning might reasonably be given to the words "accrued but unpaid compensation" in a different agreement, this agreement treats a prorated portion of Mr. Carome's compensation in 2010 as an asset of Mr. Carome's in July 2010, even though the amount of Mr. Carome's 2010 compensation would not be

precisely known until 2011. We see no justification under the agreement for treating Mr. Carome's 2017 compensation differently. We therefore agree with the trial court that a prorated amount of Mr. Carome's 2017 law-firm compensation should be treated as "accrued but unpaid compensation."

## V. Mr. Rollinger's Expert Report

Ms. Carome argues that the trial court erred by permitting an expert, Eric Rollinger, to testify on Mr. Carome's behalf at trial, even though Mr. Carome did not provide Ms. Carome with an adequate written report from the expert, as required by Super. Ct. Dom. Rel. R. 26(a)(2)(B). We agree. We conclude, however, that the error was harmless.

### A. Factual and Procedural Background

Mr. Rollinger testified for Mr. Carome as an expert concerning the calculation of damages, if any, owed based on Mr. Carome's failure to make payments into the joint account. Under Super. Ct. Dom. Rel. R. 26(a)(2)(B), Mr. Carome was required to provide Ms. Carome with a written report from Mr. Rollinger before trial. Such reports must contain "a complete statement of all opinions the witness will express

and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Super. Ct. Dom. Rel. R. 26(a)(2)(B)(i)-(ii).

Mr. Carome provided a written report from Mr. Rollinger, apparently first in February 2019 and then in revised form in March 2019. The report does not contain a single complete sentence. Rather, the first page of the report is a chart reflecting Mr. Rollinger's overall conclusions as to how much Mr. Carome earned during the marriage; what amounts were appropriately subtracted from those earnings under various provisions of the premarital agreement; the amounts of Mr. Carome's "Contributions to the Marriage" in various categories, such as "[Mr. Carome] Direct Contribution"; and the amounts of Mr. Carome's payments of "Other Necessary Expenses" in various categories, such as "Business Expense." The chart concludes that Mr. Carome "over-contributed" to the marriage by more than $350,000.

The second page of the report is a graph depicting Mr. Carome's cumulative contributions to the marriage on a monthly basis. The third page of the report is a slightly expanded version of the first page, adding a list of the amounts of various "Non-Counted Items," such as "Other Living Expenses." The report then contains month-by-month breakdowns of the chart on the first page of the report.

Finally, the report contains a spreadsheet of approximately 300 pages. That spreadsheet reflects over 20,000 individual transactions, identified by date, account, and amount. The spreadsheet also has boxes labeled "Description," "Memo," "Category," and "Tag." For many transactions, one or more of those boxes are not filled in. Examples of the comments in the "Memo" box include "Non-joint portion of 11/02/10 Invoice," "Transfer – all joint," and "Misuse of credit card by [Ms. Carome]." The "Category" box often either is empty or says "Misc." The "Tag" box is empty for many transactions. Some of the entries in that box (such as "[Mr. Carome] Contribution") do indicate how Mr. Rollinger viewed the transaction for purposes of the damages calculation, although the entries do not explain why Mr. Rollinger reached his conclusions. Other of the entries in that box (such as "[Ms. Carome] to Explain") are not clear. For each transaction, there is also a box labeled "Classification," indicating how Mr. Rollinger categorized the transaction on his chart. In some instances, the box refers to a provision of the premarital agreement, suggesting without further explanation that the provision was the basis for the categorization. In other instances (such as "Payments for Credit Cards" and "Not Included in Calculation to Avoid Double Counting"), the rationale for the categorization is not specified.

At no place does the report explain the criteria used to define the various categories reflected in the report. The report also does not state what methods or sources of information Mr. Rollinger used in preparing the report.

In the joint pretrial statement, which was filed in May 2019, Ms. Carome formally objected to Mr. Rollinger's report, arguing that the report did not comply with Super. Ct. Dom. Rel. R. 26(a)(2)(B). Specifically, Ms. Carome argued that the report did not indicate what documents Mr. Rollinger was relying on and did not explain Mr. Rollinger's opinions and his reasons for those opinions. Ms. Carome asked that the report be excluded from evidence and that Mr. Rollinger be precluded from testifying at trial. In the alternative, Ms. Carome asked the court (1) to require Mr. Rollinger to supplement his report with the information required by Super. Ct. Dom. Rel. R. 26(a)(2)(B); and (2) to permit Ms. Carome to designate a rebuttal expert and submit a rebuttal expert report.

In the joint pretrial statement, Mr. Carome responded by arguing that Ms. Carome's objection to Mr. Rollinger's report was belated, the report was adequate, and any deficiency in the report did not prejudice Ms. Carome.

On the first day of trial, Ms. Carome renewed her objection to Mr. Rollinger's report. The trial court overruled Ms. Carome's objection without explanation.

Mr. Rollinger testified at length at trial. His expert report was also admitted into evidence. During the first three days of his testimony, Mr. Rollinger explained (1) the materials he relied on in reaching his conclusions (which included various documents, oral conversations with Mr. Carome, and notes kept by Mr. Carome); (2) the meaning of various of the terms used in the report (such as "Non-Counted Items"); and (3) the methods and reasoning used in reaching the conclusions reflected in the report. Ms. Carome cross-examined Mr. Rollinger extensively at that point on the bases for his opinions.

There was a two-month break in the trial, and Ms. Carome then resumed her cross-examination of Mr. Rollinger, which extended for parts of two additional days.

Ms. Carome presented two reports from her own expert, who also testified at trial. Ms. Carome's expert concluded that Ms. Carome was entitled to over $2.6 million in damages.

In returning its verdict, the trial court largely accepted the legal framework advocated by Mr. Carome, assessing damages by calculating Mr. Carome's earnings between 2013 and November 2017 and then subtracting "authorized subtractions"— those falling within the exceptions enumerated in § 1.7(A) of the agreement—as well as other amounts that were "necessary expenses" paid by Mr. Carome for the benefit of Ms. Carome. The trial court accepted some of Mr. Rollinger's factual conclusions but also made substantial adjustments to Mr. Rollinger's calculations, for a variety of reasons, including that Mr. Rollinger had a "quite flimsy" basis for categorizing certain expenses as having been for Ms. Carome's benefit. The trial court ultimately found damages of approximately $440,000 due to Mr. Carome's breach of his obligation to make payments into the joint account.

On appeal, this court sua sponte remanded the record for the trial court to explain its decision to overrule Ms. Carome's objection to Mr. Rollinger's report. On remand, the trial court concluded that the report complied with the requirements of Rule 26(a)(2)(B). Specifically, the trial court stated that the report "sets forth a very detailed and comprehensive statement of Mr. Rollinger's conclusions and sets forth minutely specific bases for the opinions." In the alternative, the trial court ruled that any deficiencies in the report were substantially justified and harmless.

## B.  Compliance with Super. Ct. Dom. Rel. R. 26(a)(2)(B)

We review the trial court's ruling that Mr. Rollinger's report met the requirements of Super. Ct. Dom. Rel. R. 26(a)(2)(B) deferentially, to determine whether the trial court acted within the scope of its discretion.  *See generally, e.g.*, *Weakley v. Burnham Corp.*, 871 A.2d 1167, 1179 (D.C. 2005) ("We review discovery orders for abuse of discretion.").  *See also, e.g.*, *Harmon v. Ga. Gulf Lake Charles L.L.C.*, 476 F. App'x 31, 36 (5th Cir. 2012) (trial court rulings under Fed. R. Civ. P. 26(a)(2)(B) are reviewed for abuse of discretion).  Super. Ct. Dom. Rel. R. 26(a)(2)(B) is identical to Fed. R. Civ. P. 26(a)(2)(B), so we give weight to cases interpreting the federal rule.  *See generally, e.g.*, *Segreti v. DeIuliis*, 263 A.3d 441, 444 (D.C. 2021) (when interpreting Superior Court rule, court looks for guidance to federal cases interpreting "substantially identical" federal rule) (internal quotation marks omitted).

As previously noted, Super. Ct. Dom. Rel. R. 26(a)(2)(B) generally requires expert reports to include, among other things: "(i) a complete statement of all opinions the [expert] will express and the basis and reasons for them; [and] (ii) the facts or data considered by the [expert] in forming them."  This court does not appear

to have issued any opinions interpreting either that language or identical language in Super. Ct. Civ. R. 26(a)(2)(B). We therefore consider pertinent federal authority.

"When interpreting a Superior Court rule, we frequently find guidance in the advisory committee's notes to the corresponding federal rule." *C.R. Calderon Constr., Inc. v. Grunley Constr. Co.*, 257 A.3d 1046, 1059 (D.C. 2021) (internal quotation marks omitted). The language at issue was added to Fed. R. Civ. P. 26(a)(2) in 1993. *See* Fed. R. Civ. P. 26(a)(2) advisory committee's note to 1993 amendment. The advisory committee explained that the amended rule "imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Id.* The advisory committee stated that disclosure under the prior rule had often been "sketchy and vague." *Id.* The new rule, in contrast, required "a detailed and complete report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." *Id.* In other words, the report should "set forth the substance of the direct examination." *Id.*

In our view, Mr. Rollinger's report fell well short of the requirements of Super. Ct. Dom. Rel. R. 26(a)(2)(B). The report has no complete sentences, says

nothing explicit about the sources of information Mr. Rollinger relied upon, does not explain the methods Mr. Rollinger used in making calculations, and contains a number of unexplained or cryptic terms and categories. Mr. Carome cites no case holding that a comparable report was adequate, and we are aware of no such case. To the contrary, comparable reports appear to have consistently been found inadequate. *See, e.g.*, *Martinez v. Sw. Cheese Co.*, No. CV 12-0660, 2013 WL 12180705, at \*2 (D.N.M. Mar. 4, 2013) (finding expert report inadequate because report contained "several pages of charts and calculations without any context" and failed to "fully explain[] [the charts'] relevance, their calculations, or their sources"); *Great White Bear, LLC v. Mervyns, LLC*, No. 06 CV 13358, 2008 WL 2220662, at \*3 (S.D.N.Y. May 27, 2008) ("A damage figure in an expert report cannot satisfy [federal] Rule 26(a)(2)(B) simply by stating a conclusory figure and then attaching documents that purportedly support that figure. Rather, the report must supply actual calculations with detailed and complete information elucidating how the expert arrived at the damage figure."). *See generally, e.g.*, *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (upholding exclusion of expert report that failed to adequately explain expert's "line of reasoning"; "[e]xpert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions") (internal quotation marks omitted).

In sum, we conclude that the trial court acted outside its discretion in concluding that Mr. Rollinger's report met the requirements of Super. Ct. Dom. Rel. R. 26(a)(2)(B).

## C. Harmlessness

Mr. Carome's failure to comply with Super. Ct. Dom. Rel. R. 26(a)(2)(B) is not a basis for relief if that failure was harmless. Super. Ct. Dom. Rel. R. 37(c)(1) (failure to comply with Super. Ct. Dom. Rel. R. 26(a) precludes admission of testimony of witness unless failure was "substantially justified or harmless"). *See generally* Super. Ct. Dom. Rel. R. 61 ("Unless justice requires otherwise, no error in admitting . . . evidence . . . is ground for granting a new trial, or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 567 (D.C. 2001) (error does not affect substantial rights if court can "say[] with fair assurance" that "judgment was not substantially swayed by the error") (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). The burden of establishing harmlessness is on the party who failed to comply with the rule. *See, e.g.*, *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001) ("[I]t is the obligation

of the party facing sanctions for belated disclosure to show that its failure to comply with [Fed. R. Civ. P. 26(a)] was either justified or harmless . . . ."); *Hinton v. United States*, 979 A.2d 663, 686 (D.C. 2009) (en banc) (under *Kotteakos* test for harmlessness, burden of showing harmlessness "is on the beneficiary of an error").

As noted, the trial court ruled on remand that any deficiencies in Mr. Rollinger's report were harmless.  It is not entirely clear whether our review of that ruling is de novo or deferential.  *Compare Davis v. United States*, 564 A.2d 31, 42 (D.C. 1989) (en banc) (in context of constitutional error, court concludes that appellate court "owe[s] no deference to the trial court's views concerning harmlessness"), *with Prisco v. Stroup*, 947 A.2d 455, 462 (D.C. 2008) (court of appeals reviews for abuse of discretion trial court's determination whether to impose sanction under Super. Ct. Dom. Rel. R. 37(c)), *and Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (explaining that, under Fed. R. Civ. P. 37(c)(1), "[d]istrict courts are accorded broad discretion in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless") (internal quotation marks omitted).  The parties do not explicitly address that question, and we need not decide it.  Rather, even assuming favorably to Ms. Carome that our review is de novo, we conclude that the trial court's error was harmless.

Our reasoning differs from that of the trial court. In our view, the critical points are that Ms. Carome had a full opportunity to cross-examine Mr. Rollinger, the trial recessed for approximately two months, and Ms. Carome then had another full opportunity to cross-examine Mr. Rollinger. Granting a continuance can be an appropriate response to a party's failure to provide required pretrial discovery. *See, e.g., Weiner v. Kneller*, 557 A.2d 1306, 1310 n.5 (D.C. 1989) ("Exclusion of evidence is a severe sanction. Under [Super. Ct. Civ. R.] 37 the Superior Court may avail itself of a lesser sanction, such as a continuance, to allow the surprised party to examine the record, possibly resume discovery, and prepare some response to the unexpected testimony.") (citation omitted); *cf. Workman v. United States*, 255 A.3d 971, 976 (D.C. 2021) (under Super. Ct. Crim. R. 16, "remedies for [a] discovery violation include [the] granting of [a] continuance"). In arguing that she was prejudiced by the inadequacies of Mr. Rollinger's report, Ms. Carome lists various actions she could have taken if the report had been adequate, including possibly moving to exclude Mr. Rollinger's report and testimony as unreliable, trying to track down original documentation of transactions, and presenting evidence of contributions she made to the marriage. Ms. Carome did ultimately move to strike Mr. Rollinger's report and testimony as "subjective, unreliable[,] and riddled with errors." Ms. Carome has not, however, renewed that challenge in this court, instead focusing solely on her discovery claim. We see no prejudice to Ms. Carome's ability

to challenge the substance of Mr. Rollinger's testimony and report. As to Ms. Carome's two other assertions of prejudice, the two-month break in the trial was seemingly ample to permit Ms. Carome to take whatever steps she wished to take to further investigate and respond to Mr. Rollinger's report and testimony. *Cf. Weiner*, 557 A.2d at 1310 n.5 (explaining that continuance can be sufficient remedy to address discovery violation).

We therefore conclude that the trial court's error was not unfairly prejudicial to Ms. Carome, because in the circumstances of this case Ms. Carome had a full opportunity to address Mr. Rollinger's report and testimony.

## VI. Proof of Actual Damages

Mr. Carome argues that Ms. Carome failed to prove that she suffered actual damages as a result of Mr. Carome's breach of the premarital agreement. We are unpersuaded by that argument.

To remedy a breach of contract, the trial court generally may award the non-breaching party expectation damages: the amount that would place the non-breaching party in the position the non-breaching party would have had if the

breaching party had fulfilled its obligations under the contract. *Caesar v. Westchester Corp.*, 280 A.3d 176, 191 (D.C. 2022). Under the premarital agreement in this case, Ms. Carome was entitled to half of the assets contained in the joint account upon separation. Agreement § 5.2(A). The trial court thus arguably could have awarded Ms. Carome damages in an amount equal to half of the amount that Mr. Carome should have contributed to the joint account. The trial court did not take that approach, however, instead decreasing the amount of Ms. Carome's damages to reflect payments that the trial court determined Mr. Carome had made toward "necessary joint expenses and for Ms. Carome's benefit." Ms. Carome has not challenged that ruling in this court, and we therefore have no reason to consider whether Ms. Carome actually was entitled to more extensive damages than she was awarded.

For his part, Mr. Carome does not present a specific challenge to the trial court's calculation of the amount of the offset to reflect payments Mr. Carome made for Ms. Carome's benefit. Instead, Mr. Carome argues that Ms. Carome should have been required to prove specific additional concrete injuries she suffered as a result of Mr. Carome's breach. We see no basis for that argument. *See, e.g.*, *Caesar*, 280 A.3d at 191 (actual costs suffered by non-breaching party "of no consequence" where non-breaching party was properly awarded expectation damages).

In sum, (1) we affirm the trial court's ruling that Mr. Carome's obligation to contribute to the joint account ended on the date of separation; (2) we reverse the trial court's ruling that Mr. Carome was entitled to deduct payments made to the defined-benefit plan in years when Mr. Carome did not contribute to the joint account; (3) we affirm the trial court's ruling that Mr. Carome's earnings under the agreement included a prorated share of Mr. Carome's 2017 law-firm compensation; (4) we hold that the trial court acted outside its discretion in concluding that Mr. Rollinger's report complied with the requirements of Super. Ct. Dom. Rel. R. 26(a)(2)(B); (5) we hold that that error was harmless; and (6) we uphold the trial court's ruling that Ms. Carome was not required to prove actual costs she suffered as a result of Mr. Carome's breach of the agreement, beyond the loss of the financial contributions Mr. Carome was required to make under the agreement. We therefore vacate the judgment and remand the case to the trial court for further proceedings.

*So ordered.*